<u>**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**</u>

Name _____PLANK_____ROGER_____

     (Last)          (First)           (Initial)

Prisoner Number _____D-75871_____

Institutional Address ____CORRECTIONAL TRAINING FACILITY_____

P.O. BOX 689 / ED-017-LOW, SOLEDAD, CA 93960-0689

**FILED**

JUL - 9 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
THERN DISTRICT OF CALIFORNIA

**TEH**

---

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ROGER PLANK
_____
(Enter the full name of plaintiff in this action.)

vs.

BEN CURRY, WARDEN, et al.
_____
_____
_____
_____
(Enter the full name of respondent(s) or jailor in this action)

CV 08 3310

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT
OF HABEAS CORPUS**

**E-filing**

**(PR)**

---

<u>Read Comments Carefully Before Filling In</u>

<u>When and Where to File</u>

     You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

     If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS     - 1 -

1 | <u>Who to Name as Respondent</u>

2 | You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6 | If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11 | 1. What sentence are you challenging in this petition?

12 | (a) Name and location of court that imposed sentence (for example; Alameda

13 | County Superior Court, Oakland):

14 | CALIFORNIA SUPERIOR COURT          COUNTY OF SAN BERNARDINO

15 | Court                                  Location

16 | (b) Case number, if known ___SBD-BCR950___

17 | (c) Date and terms of sentence ___1/6/1988 / 16 YEARS TO LIFE.___

18 | (d) Are you now in custody serving this term? (Custody means being in jail, on

19 | parole or probation, etc.)          Yes _X_     No _____

20 | Where?   CORRECTIONAL TRAINING FACILITY, SOLEDAD, CA

21 | Name of Institution: ___CORRECTIONAL TRAINING FACILITY.___

22 | Address: ___P.O. BOX 689, SOLEDAD, CA 93960-0689___

23 | 2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | SECOND DEGREE MURDER.

27 |

28 |

PET. FOR WRIT OF HAB. CORPUS      - 2 -

1       3. Did you have any of the following?

2            Arraignment:                          Yes __X__    No ____

3            Preliminary Hearing:              Yes __X__    No ____

4            Motion to Suppress:              Yes ____    No ____

5       4. How did you plead?

6            Guilty __X__     Not Guilty _____    Nolo Contendere _____

7            Any other plea (specify) _____

8       5. If you went to trial, what kind of trial did you have?

9            Jury _____     Judge alone _____    Judge alone on a transcript _____

10      6. Did you testify at your trial?            Yes ____    No ____

11      7. Did you have an attorney at the following proceedings:

12         (a)    Arraignment                  Yes __X__    No ____

13         (b)    Preliminary hearing          Yes __X__    No ____

14         (c)    Time of plea                Yes __x__    No ____

15         (d)    Trial                       Yes ____    No ____

16         (e)    Sentencing               Yes __X__    No ____

17         (f)    Appeal                 Yes ____    No ____

18         (g)    Other post-conviction proceeding    Yes ____    No __X__

19      8. Did you appeal your conviction?         Yes ____    No __X__

20         (a)    If you did, to what court(s) did you appeal?

21                Court of Appeal             Yes ____    No ____

22                Year: _____       Result: _____

23                Supreme Court of California     Yes ____    No ____

24                Year: _____       Result: _____

25                Any other court             Yes ____    No ____

26                Year: _____       Result: _____

27

28         (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS      - 3 -

petition?                                    Yes _____    No_____

   (c)  Was there an opinion?                Yes _____    No_____

   (d)  Did you seek permission to file a late appeal under Rule 31(a)?

                                                    Yes _____    No__X__

      If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                Yes __X__    No_____

      [Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

   (a)  If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

      I.  Name of Court: ___CALIFORNIA SUPERIOR COURT_____

        Type of Proceeding: ___HABEAS CORPUS  WHCSS-00177  (EX. A)__

        Grounds raised (Be brief but specific):

        a.___BOARD OF PAROLE HEARINGS VIOLATED DUE PROCESS.____

        b._____

        c._____

        d._____

        Result: ___DENIED_____Date of Result:__JULY 25, 2007

      II.  Name of Court: ___CALIFORNIA COURTS OF APPEAL_____

        Type of Proceeding: ___HABEAS CORPUS   E044208  (Ex B)____

        Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1             a.    BOARD OF PAROLE HEARINGS VIOLATED DUE PROCESS

2             b._____

3             c._____

4             d._____

5             Result: __DENIED_____Date of Result: OCTOBER 24, 2007

6         III.   Name of Court: ___CALIFORNIA SUPREME COURT_____

7             Type of Proceeding: ___HABEAS CORPUS___S158989_____

8             Grounds raised (Be brief but specific):

9             a.____BOARD OF PAROLE HEARINGS VIOLATED DUE PROCESS____

10            b._____

11            c._____

12            d._____

13            Result: ___DENIED_____Date of Result: JUNE 18, 2008

14         IV.   Name of Court: _____

15 **TIME LINE**      Type of Proceeding: _____

16 **BPH HEARING**     Grounds raised (Be brief but specific):
    **DECISION FINAL**

17 **12/7/06**        a._____

CAL. GOV.
REVIEW EXP. 18   SUPERIOR CT. FILED b._____
1/7/07        **JULY 17, 07**
        **FINAL 7/25/07**

19            c._____
      **APPELLATE CT. FILED**

20    **OCT. 2007**     d._____

21    **FINAL 10/24/07**   Result: _____Date of Result:_____

      **CAL. SUPREME CT.**
22     (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?
     **FILED 12/12/07**

23    **FINAL 6/18/08**                Yes _____   No X

MAKING THIS 24        Name and location of court: _____
PETITION
TIMELY 25   **B. GROUNDS FOR RELIEF**

26       State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

    PET. FOR WRIT OF HAB. CORPUS     - 5 -

need more space. Answer the same questions for each claim.

(Note: you must present ALL your claims in your first federal habeas petition. Subsequent petitions can be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant, 499 U.S. 467, 113 L.Ed.2d 517, 111 S.Ct. 1454 (1991)]

Claim One: **BOARD OF PAROLE HEARINGS VIOLATED MY FEDERAL DUE PROCESS RIGHTS.  SEE PROCEEDING PAGES.**

Supporting Facts:                **SEE PROCEEDING PAGES.**

Claim Two:

Supporting Facts:

Claim Three:

If any of these grounds was not previously presented to any other court, state briefly **which** grounds were not presented and why:

PETITION WRIT OF HAB CORPUS          - 6 -

1    **STATEMENT OF THE FACTS**

2    PROSECUTION VERSION:

3    On April 2, 1987, Petitioner conspired with Loretta Groat to

4    kidnap Groat's daughter, 18year old Jennifer Jones from

5    Petitioner's home. After Jones was kidnapped, she was bound,

6    gagged and driven to a remote desert location where she was shot

7    and her body disposed of in an abandoned mine shaft. Both

8    Petitioner and Groat conspired together in the planning and

9    commission of Jones' murder and then disposed of the evidence

10   in an attempt to avoid arrest and conviction. Groat did admit

11   that she alone, drove her daughter to the desert and murdered

12   her.

13   DEFENSE VERSION:

14   The victim's mother, Loretta Groat, had met Mr. Sherman

15   Giles in North Carolina in April 1985. As a couple, Groat and

16   Giles moved to California in May 1986. Groat's pregnant 17 year

17   old daughter, Jennifer Jones accompained them.

18   Groat and Giles had Jones reside with one of Giles' employees

19   Mr. Roger Plank (Petitioner). From December 1986 to March 1987,

20   Groat caught her boyfriend (Giles) having sex with her daughter

21   Jennifer. Groat also found pictures depicting them having sex.

22   Groat also received reports that her daughter was molesting

23   the children of a Mrs. Joanne Knagg, who Jennifer was baby-

24   sitting.

25   Groat discussed all the aforementioned with Petitioner.

26   Petitioner also stated his dissatifaction with Jennifer in not

27   cleaning up after herself in Petitioner's apartment.

**6 a**

1      Thus, On March27, 1987, Petitioner called in sick regarding
2   work. Petitionerthen met Groat at a parking lot and gave her
3   his bosses (Giles) shotgun, at her request. Petitioner was
4   under the impression that Groat was going to scare her
5   daughter Jennifer with it...but would only discharge the firearm
6   in the air. Petitioner had no further involvement. Groat then
7   drove Jennifer to a remote location and shot her twice.
8   //
9   //

6 b

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

CALIFORNIA'S PAROLE SCHEME GIVES RISE TO A COGNIZABLE DUE PROCESS
PROTECTED LIBERTY INTEREST IN RELEASE ON PAROLE UNDER ARTICLE 14 OF
THE UNITED STATES CONSTITUTION. THUS, THE BOARD'S DENIAL OF PAROLE
MUST BE SUPPORTED BY SOME EVIDENCE THAT PETITIONER'S RELEASE WOULD
UNREASONABLY ENDANGER SAFETY IN ACCORDANCE WITH CALIFORNIA PENAL CODE
§3041 AND CALIFORNIA CONSTITUTION ARTICLE V, §8, SUBD.(b).

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

The Board of Parole Hearings (B.P.H.) decision to deny parole, finding

Petitioner poses an unreasonable risk of danger, is not supported by

any evidence in the record. Since all evidence reflects that Petitioner

would pose no threat to public safety if released. Thus violating

Petitioner's rights as guaranteed under Article 5 §8(b) of the

California Constitution and under the Due Process Clause of the

Fourteenth Amendment of the United States Constitution.

    Petitioner contends that he was denied Due Process...(1) The

B.P.H. finding that Petitioner poses an unreasonable risk of danger

is not supported by any evidence, since all of the evidence shows

that Petitioner would pose no threat to public safety if released

...(2) The unsuitability factors outweigh the suitability factors

...(3) Each ground relied upon by the B.P.H. to deny lacked support.

CONTINUED ON PAGES 6 a – 6 f.

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

The Fifth and Fourteenth Amendments prohibit the government from

depriving an inmate of life, liberty or property without due process

of law (U.S. Constitution, Amendments V, XIV). In the parole context,

a violation of an inmate's due process occurs when (1) the inmate has

CONTINUED ON PAGES 6 g.

**PETITION FOR WRIT OF HABEAS CORPUS**

(...CONTINUED SUPPORTING FACTS)

1  The B.P.H.'s relience upon Petitioner's commitment offense
2  lacks support for Petitioner's involvement was nominal and
3  Petitioner was under great stress from being murdered himself
4  ...(4) There is no nexus between Petitioner's offense and
5  Petitioner's parole risk...(5) The B.P.H. failed to base it's
6  decision on the codified suitability/unsuitability criteria.

7  On August 9, 2006, The California Board of Parole Hearings
8  (B.P.H.) conducted a hearing and after deliberation, denied
9  parole to Petitioner for the fifth time. Said decision became
10  final on December 7, 2006 (See seperately bound EXHIBIT "A"
11  for full B.P.H. transcript).

12  **THE DECISION TO DENY PAROLE**

13  The B.P.H. first stated,"...Mr. Plank (Petitioner) this is
14  a very difficult decision for [US] today because there is so
15  much information that we went over to try to make some sense
16  out of what your version of the story is as compared to what's
17  in the record." (Presiding Commissioner Biggers at page 53,
18  brackets added for emphasis). Thus, the B.P.H. commissioner
19  specifically states that the board members based there decision
20  to deny on the unchanging event that led to Petitioner's
21  early stage guilty plea.

22  Commissioner Biggers went on to state that "...the prisoner
23  is not suitable for parole and would pose an unreasonable risk
24  of danger to society or a threat to public safety if released
25  from prison." "The crime was a very especially cruel, callous
26  cold-blooded crime where an 18-year-old girl lost her life.
27  (Page 54).

6 d

(...CONTINUED SUPPORTING FACTS)

1    Biggers further stated,"Yeah, I understand you're sorry and
2  I understand that you've taken [FULL] responsibility for what
3  your portion was." Biggers then states that Petitioner's version
4  of the events differs from the District Attorney's version
5  from the murderer      herself to help her cause) and until
6  Petitioner "...maybe reaches down inside to figure out..." his
7  participation (Page 55, brackets added for emphasis).

8    The B.P.H. also stated that it considered Petitioner's
9  "unstable social history" and "experimented with marijuana and
10  cocaine in the past prior to the current offense. (Page 56).

11    Biggers further stated that Petitioner had to "Firm up...
12  your parole plans." Because Petitioner had no firm job
13  commitments. (Page 58).

14    Furthermore, Deputy Commissioner Morris commented, inter
15  alia, with: "I just want to concur with the things that the
16  chair (Biggers) has said, and I also want to tell you that I
17  really wrestled with your version of the crime. I'm wrestling
18  with the inconsistencies...the things that you said and as I
19  measure that against what I have here, this whole C-file
20  (Central Prisoner File), your comments fly in the face of
21  accepting [FULL] responsibility. It makes me question your level
22  of remorse. I'm not seeing you being completely honest about
23  your level of involvement...I sense a level of remorse, but I
24  don't see you as being where you need to be yet." (Page 56).

25    On the flip side, Commissioner Biggers stated, "You have
26  programed [EXTREMELY] well. There's no getting around that."
27  Biggers then lists all of Petitioner's accomplishments. and then

(...CONTINUED SUPPORTING FACTS)

1  states, "and I'm not going to say that your're not going to

2  get a date. It's just that at this point, you know, it's very

3  difficult to do that because of the          inconsistencies in

4  the stories." (Page 56, brackets added for emphasis).

5      The B.P.H. then moves on to note that Petitioner's

6  psychological evaluation, "was favorable" and quoted the

7  psych. evaluation as follows; "Mr. Plank did not pose

8          anymore risk to society than the average citizen.
           And based on life experiences and maturity and
9          growth, he poses less risk to society than the
           average citizen in the community."
10  (Page 57).

11     "Although I've commended you for a lot of things, these

12  behaviors do not outweigh the factors of unsuitability. This

13  will be a one year denial..." (Biggers at page 58).

14     In summation, the B.P.H. stated that Petitioner has

15  programed "EXTREMELY WELL" inside the prison walls. But because

16  Petitioner is not remorseful enough, we will see you again

17  next year. Oh Yah, and nail down a job.

18  Obviously, the B.P.H. has abused it's authority in stating

19  that Petitioner poses an unreasonable risk to society.

20  //

21  //

22

23

24

25

26

27

**6 f**

1  been deprived of a constitutionally protected liberty interest
2  in parole and (2) the inmate has been denied procedural
3  protections in the parole process. (See, e.g., **BIGGS v. TERHUNE**
4  **(9th Cir. 2003) 334 F.3d 910, 913.**

5  A. <u>DUE PROCESS REQUIRES THAT SOME EVIDENCE SUPPORT A PAROLE DENIAL</u>

6      A California prisoner with a sentence of a term of years to
7  life with the possibility of parole has a protected liberty
8  interest in release on parole and therefore a right to due
9  process in the parole suitability proceedings. See, **SASS v.**
10 **CALIFORNIA BOARD OF PRISON TERMS (9th Cir. 2006) F.3d 1123, 1127**
11 **-1128; BOARD OF PARDONS v. ALLEN (1987) 482 U.S. 369; GREENHOLTZ**
12 **v. INMATES OF NEBRASKA PENAL & CORR. COMPLEX (1979) 442 U.S. 1;**
13 **CAL. PENAL CODE §3041 (b).**

14     A parole board's decision satisfies the requirements of due
15 process if "some evidence" supports the decision. **SASS at 461**
16 **F.3d at page 1128-29 [adopting some evidence standard for**
17 **disciplinary hearings outlined in SUPERINTENDENT v. HILL (1985)**
18 **472 U.S. 445, 454-455].**

19    "To determine whether the some evidence standard is met 'does
20 not require examination of the entire record, independent
21 assessment of the credibility of witnesses, or weighing of the
22 evidence in the record that could support the conclusion
23 reached' "by the parole board or the governor. **Id. at 1128**
24 **[quoting SUPERINTENDENT v. HILL, 472 U.S. at pages 455-456].**
25 The "some evidence standard is minimal and assures that 'the
26 record is not so devoid of evidence that the findings of the...
27 board were without support or otherwise arbitrary.' "**Id. at 1129**

1 [quoting SUPERINTENDENT v. HILL, 472 U.S. at page 457]. The
2 some evidence standard of **SUPERINTENDENT v. HILL** is clearly
3 established law in the parole context for purposes of § 2254(d).
4 SASS, **461 F.3d at page 1129.**

5   A critical issue in parole denial cases concerns the B.P.H.'s
6 use of evidence about the murder that led to the conviction.
7 Three Ninth Circuit cases provide the guideposts for applying
8 the **SUPERINTENDENT v. HILL** some evidence standard on this point:
9 BIGGS v. TERHUNE, (9th Cir. 2003) 334 F.3d 910; SASS v. CALIFORNIA
10 BOARD OF PRISON TERMS (9th Cir. 2006) 461 F.3d 1123 and IRONS v.
11 CAREY (9th Cir. 2007) 479 F.3d 658. BIGGS explained that the
12 value of the criminal offense fades over time as a predictor of
13 parole suitability: "The Parole Board's decision is one of
14 'equity' and requires a careful balancing and assessment of the
15 factors considered...A continued reliance in the future on an
16 unchanging factor, the circumstances of the offense and conduct
17 prior to imprisonment, runs contrary to the rehabilitative
18 goals espoused by the prison system and could result in a due
19 process violation." BIGGS, 334 F.3d at page 916-917. BIGGS
20 upheld the initial denial of a parole release date based solely
21 on the nature of the crime and the prisoner's conduct before
22 incarceration, but cautioned that "[o]ver time..., should Biggs
23 continue to demonstrate exemplary behavior and evidence of
24 rehabilitation, denying him a parole date simply because of the
25 nature of Biggs' offense and prior conduct would raise serious
26 questions involving his liberty interest in parole." Id. at 916.
27 Next came SASS, which critized the BIGGS statements as improper

1    and beyond the scope of the dispute before the court: "Under
2    AEDPA it is not our function to speculate about how future
3    parole hearings could proceed." **SASS, 461F.3d at page 1129.**
4    **SASS** determined that the parole board is not precluded from
5    relying on unchanging factors such as the circumstances of the
6    commitment offense or the parole applicant's preoffense behavior
7    in determining parole suitability. **See id. at page 1129**
8    (commitment offenses in combination with prior offenses provided
9    some evidence to support denial of parole at subsequent parole
10   consideration hearing). Recently, **IRONS** determined that due
11   process was not violated by the use of the commitment offense
12   and pre-offense criminality to deny parole for a prisoner 16
13   years into his 17-to-life sentence. **IRONS** emphasized that all
14   three cases (**IRONS, SASS** and **BIGGS**) in which the court had
15   "held that a parole board's decision to deem a prisoner
16   unsuitable for parole solely on the basis of his commitment
17   offense comports with due process, the decision was made before
18   the inmate had served the minimum number of years required by
19   his sentence." **IRONS, 479 F.3d at page 665; id. at page 660**
20   (inmate in 16th actual year of his 17-to-life sentence).

21       The message of these three cases is that the B.P.H. can look
22   at immutable events, such as the nature of the conviction
23   offense and pre-conviction criminality, to predict that the
24   prisoner is not currently suitable for parole even after the
25   initial denial (**SASS**), but the weight to be attributed to those
26   immutable events should decrease over time as a predictor of
27   future dangerousness as the years and the prisoner demonstrates

1  favorable behavior (**BIGGS** and **IRONS**). **SASS** did not dispute the
2  principle that, other things being equal. a murder committed
3  50 years ago is less probative of a prisoner's current
4  dangerousness than one committed 10 years ago. Not only does
5  the passage of time in prison count for something, exemplary
6  behavior and rehabilitation in prison count for something
7  according to **BIGGS** and **IRONS. SUPERINTENDENT v. HILL'S**
8  standard might be quite low, but it does require that the
9  decision **not** be arbitrary, and reliance on only the facts of
10  the crime might eventually make for an arbitary decision.

11  Having determined that there is a due process right, and that
12  some evidence is the evidentiary standard for judicial review,
13  the next step is to look to state law because that sets the
14  criteria to which the some evidence standard applies. One must
15  look to state law to answer the question, 'some evidence' of
16  what?"

17  B. STATE LAW STANDARDS FOR PAROLE FOR MURDERS IN CALIFORNIA

18  California uses indeterminate sentences for most non-capital
19  murderers, with the term being life imprisonment and parole
20  eligibility after a certain minimum number of years. A first
21  degree murder conviction yields a base term of 25 years to
22  life and a second degree murder conviction yields a base term of
23  15 years to life imprisonment. **See In re DANNENBERG, Cal.4th**
24  **1061, 1078, 23 Cal.Rptr.3d 417, cet. denied ___U.S.___, 126 S.Ct**
25  **92, 163 L.Ed.2d 109 (2005); Cal. Penal Code §190.** California's
26  parole scheme described below provides that a release date
27  normally must be set unless various factors exist, but the

**6 j**

1  "unless" qualifier is substantial.

2     A B.P.H. panel meets with an inmate one year before the
3  prisoner's minimum eligible release date "and shall normally
4  set a parole date...The release date shall be set in a manner
5  that will provide uniform terms for the offenses of similar
6  gravity and magnitude in respect to their threat to the public
7   and that will comply with the sentencing rules that the Judical
8  Council may issue and and any sentencing information relevant
9  to the setting of parole release dates." Cal.Penal Code §3041(a).
10 Significantly, that statute also provides that the panel "shall
11 set a release date unless it determines that the gravity of the
12 current convicted offense or offenses, or the timing and gravity
13 of current or past convicted offense or offenses, is such that
14 consideration of the public safety requires a more lengthy
15 period of incarceration for this individual, and that a parole
16 date, therefore, cannot be fixed at this meeting." Cal.Penal
17 Code §3041(b).

18    One of the implementing regulations, 15 Cal.Code Regs.
19 §2401, provides: "A parole date shall be denied if the prisoner
20 is found unsuitable for parole under Section 2401(c). A parole
21 date shall be set if the prisoner is found suitable for parole
22 under section 2402(d). Aparole date set under this article shall
23 be set in a manner that provides uniform terms for offenses of
24 similar gravilty and magnitude with respect to the threat to
25 the public."

26    The unsuitability list of 2401(c) is listed as follows;
27 "(1) COMMITMENT OFFENSE. The prisoner committed the offense in

**6 k**

1  an especially heinous, atrocious or cruel manner. The factors
2  to be considered include:

3      "(A) Multiple victims were attacked, injured or killed in
4  the same or seperate incidents.

5      "(B) The offense was carried out in a dispassionate and
6  calculated manner, such as an execution style murder.

7      "(C) The victim was abused, defiled or mutilated during or
8  after the offense.

9      "(D) The offense was carried out in a manner which demon-
10 strates an exceptionally callous disregard for human suffering.

11     "(E) The motive for the crime is inexplicable or very trival
12 in relation to the offense.

13 "(2) PREVIOUS RECORD OF VIOLENCE. The prisoner on previous
14 occasions inflicted or attempted to inflict serious injury on
15 a victim, particularly if the prisoner demonstrated serious
16 assaultive behavior at an early age.

17 "(3) UNSTABLE SOCIAL HISTORY. The prisoner has a history of
18 unstable or tumltuous relationships with others.

19 "(4) SADISTIC SEXUAL OFFENSES. The prisoner has previously
20 sexually assaulted another in a manner calculated to inflict
21 pain or fear upon the victim.

22 "(5) PSYCHOLOGICAL FACTORS. The prisoner has a lengthy history
23 of severe mental problems related to the offense.

24 "(6) INSTITUTIONAL BEHAVIOR. The prisoner has engaged in
25 serious misconduct in prison or jail."

26     The suitability list of 2401(d) is listed as follows;
27 "(1) NO JUVENILE RECORD. The prisoner does not have a record of

1  assaulting others as a juvenile or committing crimes with a

2  potential or personal harm to victims.

3  "(2) STABLE SOCIAL HISTORY. The prisoner has experienced

4  reasonably stable relationships with others.

5  "(3) SIGNS OF REMORSE. The prisoner performed acts which tend

6  to indicate the presence of remorse, such as attempting to

7  repair the damange seeking help for or relieving suffering of

8  the victim, or indicting that he understands the nature and

9  magnitude of the offense.

10  "(4) MOTIVATION FOR CRIME. The prisoner committed his crime as

11  the result of significant stress in his life, especially if

12  the stress has built over a long period of time.

13  "(5) BATTERED WOMAN SYNDROME. At the time of the commission of

14  the crime, the prisoner suffered from Battered Woman Syndrome

15  as defined in section 2000(b) and it appears the criminal

16  behavior was the result of that victimization.

17  "(6) LACK OF CRIMINAL HISTORY. The prisoner lacks any

18  significant history of violent crime.

19  "(7) AGE. The prisoner's present age reduces the probability of

20  recidivism.

21  "(8) UNDERSTANDING AND PLANS FOR FUTURE. The prisoner has made

22  realistic plans for release or has developed marketable skills

23  that can be put to use upon release.

24  "(9) INSTITUTIONAL BEHAVIOR. Institutional activities indicate

25  an enhanced ability to function within the law upon release.

26  LEFT BLANK

27  LEFT BLANK

1    The regulation also provides that "[t]he panel shall first

2    determine whether the life prisoner is suitable for release on

3    parole. Regardless of the length of time served, a life prisoner

4    shall be found unsuitable for and denied parole if in the

5    judgement of the panel the prisoner will pose an unreasonable

6    risk of danger to society if released from prison." 15 Cal.Code

7    Regs. §2402(a). The panel may consider all relevant and reliable

8    information available to it.

9    C. THE B.P.H. DECISION IS NOT SUPPORTED BY SOME EVIDENCE.

10   The B.P.H. identified four reasons for it's decision that

11   Petitioner is unsuitable for parole...(1)Unstable social history

12   ...(2)Plans for parole...(3)Little to no remorse...(4)The

13   commitment offense.

14                     1. UNSTABLE SOCIAL HISTORY

15   The B.P.H. relied on Petitioner's unstable social history,

16   according to them, for unsuitability. Stating that they looked

17   at Petitioner's history where he quit school at the 11th grade

18   level. And there was some indiction that Petitioner had

19   experimented  with marijuana and cocaine in the past prior to

20   the current offense. (B.P.H. transcript at page 56.)

21   However, this observation by the B.P.H. has no validity

22   here. Quitting school at the 11th grade level   . no way in the

23   slightest qualifies as unstable social history. Particulary

24   when Petitioner has no juvenile or adult arrests or convictions.

25   Even the 2006 and 2004 Lifer report at page 2. states that

26   Petitioner's childhood was normal...mental status was within

27   normal limits...there was no evidence of any mental or emotional

1 | problems...his thinking was rational and logical...his speech
2 | was normal, fluent and goal oriented...intellectually he was
3 | functioning in the average to high average ranges...his memory
4 | was intact...his judgement was intact...his insight and self-
5 | awareness were good...Mr. Plank does not have a history of drug
6 | or alcohol abuse problems. He stated that he experimented
7 | briefly as 'a teenager with drugs, but never became involved with
8 | them. However, he attends Alcoholics Anonymous. Although he does
9 | not need to attend...because he does not have a history of
10 | drinking, he goes to this program because it is a self-help
11 | program, and he believes that it may help him understand life
12 | better.  See EXHIBIT "D" for mental health report.

13 | Obviously, the B.P.H. got it wrong here. There was no
14 | unstable social history.

15 | ## 2. PAROLE PLANS

16 | Because Petitioner did not have a current letter from his
17 | potentional future employer. The B.P.H. stated that Petitioner
18 | had to "firm up" the parole plans. However, Petitioner's 2006
19 | Lifer Prisoner Evaluation Report at page 2, item IV-Future Plans
20 | states the following; "Plank plans to reside with his friend,
21 | Mike Scalase. His address is 521 South E. Street, Santa Rosa,
22 | California. [telephone number omitted here]...Plank stated that
23 | he will work with Maggiora and Chilotti, a construction and
24 | trucking company in Santa Rosa...Plank appears to have realistic
25 | parole plans..."  See EXHIBIT "C" for evaluation report.

26 | Further, B.P.H. Commissioner Morris noted that Petitioner
27 | had completed vocation in upholstery in 1997, completed

1   vocation in machine repair mechanic, completed vocation as a
2   sewing machine operator, and computer·skills. Morris stated
3   that Petitioner's skills would be saleable in manufacturing.
4   (Pages 28-33).

### 3. SIGNS OF REMORSE
### &
### 4. THE COMMITMENT OFFENSE

7   The B.P.H. stated that Petitioner was not fully sincere
8   in his remorse. That his version of events greatly differed
9   from the District Attorney's version (which came from the
10  woman who shot and killed her own daughter). However, Petitioner
11  has been honest and sincere with his remorse. Petitioner stated
12  at this hearing and at every hearing that he was sorry for what
13  happened...admitted his envolvement...admitted that he should
14  of stopped it (Pages 18-20).

15  Further, Petitioner's mental Health Report states; "Mr. Plank
16  discussed the circumstances of the commitment offense at
17  length. He accepts full responsibility for his role in the
18  commitment offense. He stated, "I did give her the shotgun. I
19  am guilty as if I shot her myself." He stated that it was a
20  very serious mistake to ever give the shotgun to the mother...
21  He also feels very badly that he did not contact the police in
22  time in order to report the situation." "His feelings of sorrow
23  and remorse appear to be quite sincere and genuine." (Pages 2-
24  3). Thus, again, the B.P.H. has misstated the recorded facts.

25  As to the commitment offense itself. Although Petitioner
26  was not at the scene of the crime. Nor directly had any contact
27  with the victim. Petitioner does maintain that giving the

**6 p**

1  shotgun to the mother was the same as if Petitioner pulled the
2  trigger himself. Petitioner does not dispute that this crime
3  was terrible. But the fact  that the crime was cruel, will
4  remain the same 20 years from now as it did 20 years ago.
5  Notwithstanding the terrible nature of the crime, the critical
6  question the B.P.H. was supposed to decide at the parole
7  suitability hearing was whether "consideration of the public
8  safety requires a more lengthy period of incarceration for
9  this individual." See Cal.Penal Code §3041(b). When the
10  totality of circumstances are considered, Petitioner's 1987
11  case is the opposite of BIGGS and IRONS. But those decisions
12  cautioned that continued reliance on the immutable events of
13  the crime to deny parole for present dangerousness despite the
14  candidate's exemplary behavior in prison, favorable psychological
15  reports, and absence of any other violence or criminal record.
16  Reduces the predictive value of the 1987 crime.

17  THe some evidence standard provides protection against more
18  than fabricated charges or bureaucratic mistakes-the some
19  evidence standard also protects against arbitary decisions.
20  See, SUPERINTENDENT v. HILL, 472 U.S. at 454-55, 457.

21  On July 25, 2007, the San Bernardino Superior Court denied
22  this Habeas Corpus Petition. The Honorable Court first presents
23  a brief summary of the Board hearing (pages 1&2) and at line 23
24  of page 2, the court states it is not allowed to second guess
25  the Board's decision, but to review the evidence utilized by the
26  Board to justify the denial.

27  The Court then states that because Petitioner was not candid

28

1  with the Board about "...aal of..." his actions. The Board was
2  within it's rights to deny parole on this sole basis. The Court
3  cited no authority to support this conclusion.

4      Petitioner's commitment offense repeatedly has been relied
5  on to deny parole notwithstanding the extensive evidence of
6  good behavior and rehabilitation in prison. There was a complete
7  absence of evidence of any other violent acts by Petitioner and
8  a complete absence of any criminal record. As well as an absence
9  of any suggestion of need for therapy or self-help by mental
10  health professionals who examined Petitioner.

11      Under these circumstances, the B.P.H.'s reliance on the
12  circumstances of the murder to find Petitioner unsuitable for
13  parole for the fifth time is arbitary and does not comport with
14  the some evidence standard. Therefore, Petitioner is entitled
15  to have his term set.

16  //
17  //

In a nut shell, Petitioner has paid his debt to society, served his Statutory Punishment Term, taken numerous programs, has gain appropriate insight of his criminal behavior, yet this current Panel continues to allege contrary "reasons" to justify their denial of Petitioner's Parole because of his crimes. While the Panel assured Petitioner they would only deny parole if they found he would pose an unreasonable risk of "danger" to society if released from prison see Exhibit "A", their "reasons" reflects otherwise, Petitioner's "record" demonstrates he is no longer a danger or unreasonable risk to public safety if released from prison.

While the Panel claim to apply factors from Cal. Code of Regs. 2402, Both the California and Federal Courts have made clear:

Findings necessary to deem Petitioner unsuitable for parole, is not a particular factor exists, but that Petitioner's release endangers the public; and The test is not whether some evidence supports the "reasons" cited by the Board to deny parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.  Dannenberg 156 Cal.App.4th at 1400; In re SINGLER (2008) 1/61 Cal.App.4th 281; In re Lawrence, (2007) 59 Cal.Rptr.3d 537, 561; In re Lee, (2006) 143 Cal.App.4th 1400, 1408; Hayward v. Marshall, (2008) 512 F.3d 536, 543.

To properly understand this test, the California Courts of Appeal in Lawrence (2007) 59 Cal.Rptr.3d 537, 559, found:

"Other than rehabilitation, imprisonment of those who are convicted of committing crimes generally serves and is justified by one or more of three societal goals":

(1) RETRIBUTION -- that is punishment of the offender commensurate with the seriousness of the crime;

(2) DETERRENCE OF FUTURE OFFENSES -- by either the offender or other potential offenders.

(3) INCAPACITATION OF THE OFFENDER -- so he is not free to commit other offenses.

When the Legislature sets an indeterminate maximum term with a fixed minimum term, the latter can be viewed as setting the period of imprisonment deemed necessary to satisfy the first two purposes, while the justification for continued imprisonment beyond that fixed minimum depends on the need for continued incapacitation of the offender.
   California's sentencing structure in murder cases makes it clear the denial of parole can only be justified by the third of these purposes -- the need for further incapacitation of the prisoner. "Unless there is an unreasonable risk the parole applicant will re-offend and thus pose a risk to public safety she or he is to be released on parole. In re Lawrence, (2007) 59 Cal.Rptr.3d at 559.

Petitioner declares, with the above principle in mind, notwithstanding the factors he can never change, the Panel's reasons used to justify the denial of parole contains "no evidence" he would pose an unreasonable risk to public safety.

Petitioner's Prison "record" covering the past 15+ years, shows Petitioner has lived a sober, non-violent, crime-free lifestyle, upgraded educationally and vocationally, completed many self help programs, found to be low risk to public safety by trained professionals (see complete psych report exhibit "E"), all suitability factors which are uncontested and undisputable. And, Petitioner must be given credit for being a model prisoner for over 15+ years because life in prison had presented a myriad of opportunities to "snap" from stress see SINGLER, supra, 2008 Cal.App. LEXIS 408 at 8, another factor not considered by the Panel.

Numerous Courts have found that continual denials of parole based on immutable factors, after successful rehabilitation by the Prison System violates Due Process of Law.  See Lawrence (2007) 150 Cal.App.4th 1511; Weider (2006) 145 Cal.App.4th 570; Elkins (2006) 144 Cal.App.4th 475; Lee (2006) 143 Cal.App.4th 1400; Scott 133 Cal.App.4th 573; Hayward v. Marshall (2008) 512 F.3d 536.

In Hayward, the Ninth Circuit Court of Appeals, addressed the constitutional due process safeguards that directly apply to Petitioner's Petition for Writ of Habeas Corpus, Specifically, inter alia, three holdings by the Ninth Circuit directly effect the decision to be made in Petitioner's case listed as follows:

(1) California prisoners have a federally protected liberty interest in parole, and as such this Court must look to California Law to determine the findings that are necessary to deem a prisoner unsuitable for parole, 512 F.3d at 542;

(2) the Board's denial of parole decision must cite "some evidence" that release "currently" poses an unreasonable risk of danger to society 512 F.3d at 543-544;

(3) the Board's reliance on stale and static factors during a parole consideration hearing to deny parole violates due process 512 F.3d at 546-547.

HAYWARD CASE FACTORS.

On December 15, 1978, Hayward, with other members of the Vagos motorcycle gang, traveled to the Buccaneer Bar in Sierra Madre, California. There, he confronted a man who, according to conflicting accounts, had [several months earlier] either slapped or battered and attempted to rape Hayward's girlfriend. The confrontation turned physical and ended after Hayward stabbed the man twelve times, killing him. Hayward was convicted by a jury of second degree murder.

After Hayward's conviction Hayward remained involved with the Vagos gang and suffered numerous major disciplinary violations through the year 1989 and denied he committing the murder until 1993, Hayward had said his friends did it.

Hayward was repeatedly denied parole over the years based on his offense, his criminal history, his history of drug and alcohol use, his motorcycle gang affiliation, and his in-prison disciplinaries, inter alia.

The Ninth Circuit considered three reasons which might justify denial of

parole:

(1) past criminal history, (2) unstable social history, gang involvement, (3) the nature of the commitment offense.

At first glance the court noted all these reasons are historic, static, stale

and will never change. The Court concluded: These "reasons" do not support a

finding that Hayward would pose an unreasonable risk to "public safety" when

released on parole, specifically the Court held:

(1) Past Criminal History: Priors committed over twenty years ago "do not support a conclusion Hayward currently poses any threat to public safety".

(2) Unstable Social History: Hayward had quit the gang in 1989 and has a stable relationship with family and friends.

(3) Nature of the Commitment Offense: Notwithstanding the fact Hayward committed a "particularly egregious" crime, Hayward's crime occurred over twenty years ago, as such this unchanging factor "cannot demonstrate that Haywards release will pose an "imminent" danger to public safety".

The Ninth Circuit decided in Hayward, Supra:

The proper procedure for reviewing a habeas claim against the parole board is whether there is "some evidence" that "the prisoners release will unreasonably endanger public safety". Not whether there is some evidence the committed offenses are egregious. After reviewing Hayward's "record" the Court concluded that "no evidence" in the record supported a determination that Haywards release

**6 u**

would unreasonably endanger public safety, in arriving at this conclusion, the court determined that the denial of parole decision was based on stale and static factors in violation of due process. Thus, the Ninth Circuit found that the State Courts [the Governor [and Parole Boards]] "unreasonably" applied the "some evidence" standard to Haywards application for release on parole.

It's immaterial whether Hayward or Petitioner served more time in prison or which has had more denials of parole. What's material is Petitioner's "record"! Unlike Hayward, Petitioner has a much better prison record than Hayward, Petitioner has: no in-prison crimes, no in-prison violence, no in-prison gang involvement, Petitioner's entire prison "record", from the start, shows a continuous concentrated effort towards rehabilitation. Unlike Hayward, who involve himself with gangs and drugs in prison for a number of years prior to committing to his goal of rehabilitation. The Court must also recognize that Petitioner admitted committing his crime early on, unlike Hayward who continued denying he committing murder for years, blaming others. Yet, like Hayward, the unusual circumstances of Petitioner's crime coupled with Petitioner's continuous participation in self-help and work programs and his successful rehabilitation it is highly unlikely he will ever involve himself in a situation like this again.

Comparing Petitioner's "record", to Hayward's "record" Petitioner demonstrates that he would pose a much less risk to public safety then Hayward giving good cause why his Habeas Petition should be granted.

Yet, the Board failed to support their denial of parole with "any evidence" that Petitioner's institution "record" demonstrates him to be a risk.

Petitioner asks this Court to take judicial notice of the case In re SINGLER, supra, 161 Cal.App.4th 281, 2008 Cal.App. LEXIS 408, filed March 26, 2008. SINGLER'S petition for habeas corpus against the Board of Parole Hearings was originally denied by the California Court of Appeals, Third Appellate District, on February 1, 2007. On April 25, 2007 the California Supreme Court granted SINGLER'S petition for review and transferred the matter back to the Appellate

Court with directions to vacate their denial and order the Board to show cause why it "did not abuse its discretion and violate due process in finding petitioner unsuitable for parole and why petitioner remains a danger to public safety. The Cal. Supreme Court cited specific case sections as follows: In re Rosenkrantz, 29 Cal.4th at 683; In re Elkins, 144 Cal.App.4th 496-498; In re Lee, 143 Cal.App.4th 1408; and In re Scott, 133 Cal.App.4th 594-595.

The California Court of Appeals for the Third District determined the California Supreme Court was requiring them to review Denials of Parole under the below standards:

Scott, supra, 133 Cal.App.4th at 594-595:  The predictive value of the commitment offense may be very questionable after a long period of time.  Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny;

Elkins, supra, 144 Cal.App.4th at 496-498: Predictions of future dangerousness are exceedingly unreliable, therefore, whether the nature of the offense justifies the denial of parole must be viewed in light of "subsequent circumstances" namely the rehabilitative efforts made by the inmate while in prison;

Lee, supra, 143 Cal.App.4th at 1408 which emphasized that some evidence of the existence of a particular factor-i.e., the nature of the offense-"does not necessarily equate to some evidence the inmate's release on parole unreasonably endangers public safety."

The Singler Court then found that the Cal. Supreme Court was holding the view that Scoot, Elkins, Lee, did not conflict with Rosenkrantz.

The Singler Court then granted his petition against the Board and ordered his release from prison within 30 days.

CONCLUSION

Petitioner, having served his time for punishment, asks this Court to issue a formal Order to Show Cause directing Respondent to Cause why Petitioner would still pose an unreasonable risk to public safety if released from prison on parole.

I, declare under penalty of perjury that the foregoing is true and correct.

Roger Plank    Pro Se
6

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4    Hayward v. Marshall (2008) 512 F.3d 536.

5    _____

6    _____

7  Do you have an attorney for this petition?                          Yes____    No_X__

8  If you do, give the name and address of your attorney:

9    _____

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___June 28, 2008___                Roger Plank    Pro Se

14            Date                          Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

E-filing

TEH

CV 08   3310

(PR)

# Exhibit
# A

1   | **SUPERIOR COURT OF CALIFORNIA**
    | **COUNTY OF SAN BERNARDINO**
2   | Civil Division, Department S-32
    | 303 West Third Street
    | San Bernardino, California 92415

**COPY**

F I L E D
SUPERIOR COURT
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

3   | JUL 2 5 2007

4

5   | BY _Olivia McDonald_
    |                    DEPUTY

6

7

8   |           **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9   |            **IN AND FOR THE COUNTY OF SAN BERNARDINO**

10  |                  **SAN BERNARDINO DISTRICT**

11

12  | In re the Petition of                    )        Case No. WHCSS-00177
                                              )
13  |        ROGER PLANK,                      )        ORDER DENYING PETITION
                                              )        FOR WRIT OF HABEAS CORPUS
14  |                                          )
    | For Writ of Habeas Corpus.              )
15  |                                          )

16

17  | The Petition of ROGER PLANK for Writ of Habeas Corpus was filed in this Court on

18  | July 17, 2007.

19  | Therein, Petitioner contends that the denial of his eligibility for parole on August 9,

20  | 2006 was not supported by evidence.

21  | In support of the Petition is a copy of the transcript of the August 9, 2006 hearing.

22  | From a review of such transcript it is evident that the Board considered the following

23  | factors and the facts pertinent thereto:

24  | 1) The circumstances of the crime.

25  | Petitioner supplied a shotgun to a woman who killed her own daughter

26  | because the daughter was having sex with the mother's boyfriend. Petitioner

27  | was unhappy with the daughter since she was a messy houseguest in the house

28  | Petitioner was living in at the time. Petitioner was aware of the mother's plan to

-1-

1   another person's remorse unless the person professing remorse takes appropriate

2   blame for all of their actions.  Here, the Petitioner refused to fully explain his

3   involvement in a heinous, senseless killing.  There is obviously more to the story than

4   Petitioner consents to reveal.  But without full revelation, there can be no full atonement.

5         The Board has not acted arbitrarily or capriciously in its decision to deny

6   parole to the Petitioner.

7

8        The Petition is denied.

9

10  Dated this _____ day of July, 2007.

11

12

13                                                      **JOHN P. WADE**

14                                              JOHN P. WADE
                                                Judge of the Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

# Exhibit B

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

OCT 2 4 2007

COURT OF APPEAL FOURTH DISTRICT

## ORDER

In re ROGER EUGENE PLANK                    E044208

    on Habeas Corpus.                    (Super.Ct.No. WHCSS00177 &
                                  BCR950)

                                The County of San Bernardino

THE COURT

    The petition for writ of habeas corpus is DENIED.

McKINSTER

Acting P.J.

cc:   See attached list



# Exhibit
# C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life   )
Term Parole Consideration   )        CDC Number D-75871
Hearing of:                 )
                            )
ROGER PLANK                 )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 9, 2006

PANEL PRESENT:

Mr. Archie Joe Biggers, Presiding Commissioner
Mr. Rufus Morris, Deputy Commissioner

OTHERS PRESENT:

Mr. Roger Plank, Inmate
Ms. Candice Christensen, Attorney for Inmate
Ms. Jennifer Dawson, Deputy District Attorney
Correctional Officers Unidentified

**INMATE
COPY**

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

Tamyra Morgan              Vine, McKinnon & Hall

ii

## INDEX

Page

Proceedings ...................................... 1

Case Factors .................................... 10

Pre-Commitment Factors ......................... 23

Post-Commitment Factors ........................ 26

Parole Plans .................................... 40

Closing Statements .............................. 46

Recess .......................................... 52

Decision ........................................ 53

Adjournment ..................................... 60

Transcriber Certification ....................... 61

--oOo--

1

1        P R O C E E D I N G S

2        **PRESIDING COMMISSIONER BIGGERS:**   Good afternoon,

3    sir.

4        **INMATE PLANK:**   Good afternoon.

5        **PRESIDING COMMISSIONER BIGGERS:**   All right, this

6    is a Subsequent Parole Consideration Hearing for

7    Mr. Roger Plank, P-L-A-N-K.  CDC number is D-75871.

8    Today's date is August the 9th, 2006, and we're located

9    at the Correctional Training Facility at Soledad.   The

10   life term -- The inmate was received on January the 21st,

11   1988, from San Bernardino County.  The life term began

12   on the same date, and the Minimum Eligible Parole Date

13   was December the 1st, 1997.  The controlling offense for

14   which the inmate has been committed is one count of

15   murder, second degree, with armed firearm.  Case number

16   is CR, that's Charlie Romeo, 950, one count.  And as I

17   said earlier, it's a violation of the Penal Code 187,

18   which was enhanced by a 12022(a).  The inmate received a

19   term of 15 years to life plus one, which gives him 16

20   years total with a Minimum Eligible Parole Date of

21   12/01/97.  Now Mr. Plank, this hearing is being tape-

22   recorded.  And for the purposes of voice identification,

23   each of will state our first name and last name,

24   spelling our last name.  When it's your turn after

25   spelling your last name, please give us your CDC number.

26   I will start and move to my left.  My name is Archie Joe

27   Biggers, B-I-G-G-E-R-S, and I'm a Commissioner with the

2

1    Board of Parole Hearings.

2        **DEPUTY COMMISSIONER MORRIS:**  Rufus Morris,

3    M-O double R-I-S, Deputy Commissioner.

4        **DEPUTY DISTRICT ATTORNEY DAWSON:**  Jennifer Dawson,

5    D-A-W-S-O-N, Deputy District Attorney, San Bernardino

6    County.

7        **ATTORNEY CHRISTENSEN:**  Candice Christensen,

8    C-H-R-I-S-T-E-N-S-E-N, Attorney for Mr. Plank.

9        **INMATE PLANK:**  Roger Plank, P-L-A-N-K, D-75871.

10        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  For

11    the record, let the record reflect that there are two

12    correctional officers present for security purposes

13    only, who will not be participating in the hearing.

14    Before we begin, Mr. Plank, right under the -- right

15    next to you and under your list of all your paperwork,

16    there is an ADA statement.  Could you read that out loud

17    for us, please.

18        **INMATE PLANK:**  "The Americans with

19            Disabilities Act, ADA, is a law to help

20            people with disabilities.  Disabilities are

21            problems to make it -- to make it harder for

22            some people to see, hear, breathe, talk,

23            walk, learn, think, work, or take care of

24            themselves than it is for others.  Nobody

25            can be kept out of public places or

26            activities because of a disability.  If you

27            have a disability, you have the right to ask

3

1          for help to get ready for your Board of

2          Prison Terms' hearing, get to the hearing,

3          talk, read forms and papers, and underneath

4          the -- and understand the hearing process.

5          BPT will look at what you asked for to make

6          sure that you have a disability that is

7          covered by the ADA and that you have asked

8          for the right kind of help.  If you do not

9          get help or if you don't think that you got

10          the kind of help that you need, ask for the

11          BPT 1074 Grievance Form.  You can also get

12          help to fill it out."

13          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  In your

14     own words, sir, what does that mean to you?

15          **INMATE PLANK:**  If I have any problems at all, I

16     can get this form and have it filled out or ask for

17     help.

18          **PRESIDING COMMISSIONER BIGGERS:**  What kind of

19     problems are we talking about, sir?

20          **INMATE PLANK:**  Reading problems.  Thinking

21     problems.

22          **PRESIDING COMMISSIONER BIGGERS:**  Hearing?

23          **INMATE PLANK:**  Hearing.

24          **PRESIDING COMMISSIONER BIGGERS:**  I see that you

25     wear glasses.  Did you have those glasses on when you

26     did your C-File?

27          **INMATE PLANK:**  Yes, I did.

4

1       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You signed

2    a 1073 on December the 5th of 2005, indicating that you

3    did not have any disabilities.

4       **INMATE PLANK:**  Yes, Sir.

5       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You

6    probably should have put down that you wear glasses so

7    that we can always note that you wear glasses.  And

8    they're sort of tinted a little bit, aren't they?

9       **INMATE PLANK:**  Just a little, yes.

10       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You should

11    also put that down so that people will know that you do

12    wear glasses in the event that you need them to read.

13    Okay.  So, the information is still correct?

14       **INMATE PLANK:**  Yes.

15       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You don't

16    need a magnifying glass or anything to help you read the

17    documents?

18       **INMATE PLANK:**  No, Sir.

19       **PRESIDING COMMISSIONER BIGGERS:**  Do you have any

20    hearing impairments?

21       **INMATE PLANK:**  No, Sir.

22       **PRESIDING COMMISSIONER BIGGERS:**  Have you ever

23    been involved in the Triple CMS or EOP Program?

24       **INMATE PLANK:**  No, Sir.

25       **PRESIDING COMMISSIONER BIGGERS:**  Do you know what

26    those programs are?

27       **INMATE PLANK:**  No.

5

1       PRESIDING COMMISSIONER BIGGERS:  They're mental

2   health problems, mental health issues.  Have you ever

3   been involved in any of the mental health issues here?

4       INMATE PLANK:  No, Sir, I haven't.

5       PRESIDING COMMISSIONER BIGGERS:  Okay.  How far

6   did you get on the -- get in -- How far did you get in

7   school on the streets?

8       INMATE PLANK:  I went two weeks until my 11th year

9   was up.

10      PRESIDING COMMISSIONER BIGGERS:  Okay.  Did you

11  take any special education classes or anything?

12      INMATE PLANK:  When I was younger.

13      PRESIDING COMMISSIONER BIGGERS:  Yeah, I saw that

14  in there.  That's why I was asking.

15      INMATE PLANK:  Yes, Sir.

16      PRESIDING COMMISSIONER BIGGERS:  Okay, how many

17  years were you in special ed?

18      INMATE PLANK:  I don't remember.

19      PRESIDING COMMISSIONER BIGGERS:  You don't

20  remember.  Okay.  Do you suffer from any disability that

21  would prevent you from participating in today's hearing?

22      INMATE PLANK:  No, Sir.

23      PRESIDING COMMISSIONER BIGGERS:  Okay.  I'm going

24  to ask your Counsel, do you feel that your client's ADA

25  rights have been met?

26      ATTORNEY CHRISTENSEN:  Yes, I do.

27      PRESIDING COMMISSIONER BIGGERS:  Okay.  This

6

1    hearing is being conducted pursuant to Penal Code
2    Sections 3041 and 3042, and the rules and regulations of
3    the Board of Prison Terms governing Parole consideration
4    Hearings for life inmates.  The purpose of today's
5    hearing is to once again, sir, consider the number and
6    the nature of the crimes you were committed for, your
7    prior criminal and social history, and your behavior and
8    programming since your commitment.  We've had the
9    opportunity to review your Central File and your prior
10   transcript, and you will be given the opportunity to
11   correct or clarify the record.  We will reach a decision
12   today and inform you of whether or not we find you
13   suitable for parole and the reasons for our decision.
14   If you are found suitable for parole, the length of your
15   confinement will be explained to you.  Nothing that
16   happens here today will change the findings of the
17   court.  This Panel is not here to retry your case.  This
18   Panel is here for the sole purpose of determining your
19   suitability for parole.  Do you understand that?
20           **INMATE PLANK:**  Yes, Sir.
21           **PRESIDING COMMISSIONER BIGGERS:**  The hearing will
22   be conducted in three phases.  I will talk to you about
23   the crime you were committed for, your prior criminal
24   and social history.  Deputy Commissioner Morris will
25   then discuss with you your post conviction factors to
26   include your psychological evaluation.  And then I will
27   come back and discuss with you your parole plans, any

7

1    letters of support or opposition that may be in your

2    file.  Once that is concluded, both the Commissioners,

3    the District Attorney, and your attorney will be given

4    the opportunity to ask you questions.  The questions

5    from the District Attorney shall be asked through the

6    Chair and you will direct your answers to the Panel and

7    not to the District Attorney.  Next the District

8    Attorney, then your attorney, then you will be given an

9    opportunity to make a final statement regarding your

10   parole suitability.  Your statement should address why

11   you feel you are suitable for parole.  The Panel will

12   then recess, clear the room, and deliberate.  Once the

13   deliberations are complete, the Panel will resume the

14   hearing and announce its decision.  Now, the California

15   Code of Regulations state that, regardless of time

16   served, a life inmate shall be found unsuitable for and

17   denied parole, if in the judgment of the Panel, the

18   inmate would pose an unreasonable risk of danger to

19   society if released from prison.  You have certain

20   rights.  Those rights include the right to a timely

21   notice of this hearing, the right to review your Central

22   File, which you indicated to me that you had done.  Is

23   that correct, sir?

24          **INMATE PLANK:**  Yes, Sir.

25          **PRESIDING COMMISSIONER BIGGERS:**  And the right to

26   present relevant documents.  And I see that your Counsel

27   has given me a lot of documents here.  I'm going to ask

8

1     now Ms. Christensen does she feel that your rights have

2     been met?

3            **ATTORNEY CHRISTENSEN:** Yes, I do.

4            **PRESIDING COMMISSIONER BIGGERS:** You have an

5     additional right to be heard by an impartial Panel.  Do

6     you have any objections to the Panel members?

7            **INMATE PLANK:** No, Sir.

8            **PRESIDING COMMISSIONER BIGGERS:** Okay.  How about

9     you, Ms. Christensen?

10           **ATTORNEY CHRISTENSEN:** No, I don't.

11           **PRESIDING COMMISSIONER BIGGERS:** Okay.  I'm going

12    to ask the Deputy Commissioner if there is any

13    confidential material that will be used?

14           **DEPUTY COMMISSIONER MORRIS:** There is confidential

15    material; however, we will not be using it for this

16    hearing today.

17           **PRESIDING COMMISSIONER BIGGERS:** Okay, thank you.

18    I'm going to mark the hearing checklist as Exhibit One,

19    and I'm going to have the officers give it to your

20    attorney as well as to the District Attorney to ensure

21    that we're all working off the same set of documents.

22           **ATTORNEY CHRISTENSEN:** Everything is here.  Thank

23    you.

24           **DEPUTY DISTRICT ATTORNEY DAWSON:** Everything is

25    here.  Thank you.

26           **PRESIDING COMMISSIONER BIGGERS:** So, let the

27    record reflect that the -- both attorneys indicated that

9

1   they do have all of the documents.  You've already given

2   me -- Are there any additional documents other than what

3   you submitted?

4        ATTORNEY CHRISTENSEN:  That's it.

5        PRESIDING COMMISSIONER BIGGERS:  Are there any

6   preliminary objections?

7        ATTORNEY CHRISTENSEN:  No.

8        PRESIDING COMMISSIONER BIGGERS:  Will the inmate

9   be speaking to the Panel?

10        ATTORNEY CHRISTENSEN:  Yes, he will.

11        PRESIDING COMMISSIONER BIGGERS:  Okay.  Mr. Plank,

12   could you please raise your right hand.  Do you solemnly

13   swear or affirm that the testimony you give at this

14   hearing will be the truth and nothing but the truth?

15        INMATE PLANK:  Yes, Sir.

16        PRESIDING COMMISSIONER BIGGERS:  Okay.  There is a

17   lengthy summary of the event in the probation officer's

18   report.  And what I'd like to ask each of the attorneys,

19   if I -- do they have any objection to me incorporating

20   the Statement of Fact from the probation officer's

21   report starting on page two?

22        ATTORNEY CHRISTENSEN:  No, I don't.

23        DEPUTY DISTRICT ATTORNEY DAWSON:  No.  I note that

24   the Deputy District Attorney, who tried this case, sent

25   a letter with parts of a police report, a transcript, on

26   October 20 -- October 11th, 2002, and asked that that be

27   put in the Board packet and made part of the C-File.

10

1      **PRESIDING COMMISSIONER BIGGERS:**  It's probably in

2      the C-File.

3      **DEPUTY DISTRICT ATTORNEY DAWSON:**  Okay.

4      **PRESIDING COMMISSIONER BIGGERS:**  But I don't have

5      it as part of the Board package here.

6      **DEPUTY DISTRICT ATTORNEY DAWSON:**  I think it's

7      fine.

8      **PRESIDING COMMISSIONER BIGGERS:**  Okay.

9      **DEPUTY DISTRICT ATTORNEY DAWSON:**  Thank you.

10     **PRESIDING COMMISSIONER BIGGERS:**  Okay, so do

11     either of you --

12     **DEPUTY DISTRICT ATTORNEY DAWSON:**  No objection.

13     **PRESIDING COMMISSIONER BIGGERS:**  You have no

14     objection, okay.  So, then I will incorporate the

15     Statement of the Facts from the probation officer's

16     report starting on page two and it will go until I

17     believe it's page five.  Yeah, it will go to page five,

18     pages two through five.  Now Mr. Plank, there seems to

19     be -- there have been a couple of stories that have

20     been -- In reading your file, at one time you indicated

21     that you were not involved -- I'm sorry -- that you were

22     involved, that you were afraid of the mother.  And then

23     another time you indicated that you were not sure that

24     she would have killed her daughter.  Now, which version

25     is it?

26     **INMATE PLANK:**  I didn't believe that she would

27     actually kill her daughter.  It wasn't until after she

11

1    had done it that that I became afraid of her.

2        PRESIDING COMMISSIONER BIGGERS:  Okay.  You're a

3    pretty big guy.  I mean why would you be afraid of her?

4        INMATE PLANK:  She wasn't exactly a small woman

5    either.

6        PRESIDING COMMISSIONER BIGGERS:  Well, you know I

7    guess I asked for that, didn't I.  Well, one of the

8    things, you gave her the shotgun.  Is that correct?

9        INMATE PLANK:  Yes, Sir.

10        PRESIDING COMMISSIONER BIGGERS:  Okay.  The record

11    sort of reflects that you assisted in the planning.

12    This whole thing stems from the fact that -- Let me see

13    if I can summarize very quickly here that one, the

14    mother was upset with the daughter, Jennifer --

15    Ms. Jennifer Jones, who was the victim.  She was 18

16    years old.  Is that correct?

17        INMATE PLANK:  (Inaudible).

18        PRESIDING COMMISSIONER BIGGERS:  And she got upset

19    with her daughter because she caught her in bed with a

20    guy that she met, okay, a Mr. Giles.  Is that right?

21        INMATE PLANK:  Yes, Sir.

22        PRESIDING COMMISSIONER BIGGERS:  Then Mr. Giles

23    moved the victim, Jennifer Jones, in with you.

24        INMATE PLANK:  Yes, Sir.

25        PRESIDING COMMISSIONER BIGGERS:  And were you all

26    just -- just sharing a house or sharing a room or

27    sharing what?

12

1        **INMATE PLANK:**  It was sharing the house, yes.

2        **PRESIDING COMMISSIONER BIGGERS:**  Okay.   There was

3   nothing physical with the two of you?

4        **INMATE PLANK:**  No, Sir.

5        **PRESIDING COMMISSIONER BIGGERS:**  Okay.   And then

6   her mother -- How did you get involved with her mother?

7        **INMATE PLANK:**  I come to know her through

8   Mr. Giles.

9        **PRESIDING COMMISSIONER BIGGERS:**  Okay.   And

10   Mr. Giles and her were an item at one time.

11        **INMATE PLANK:**  Yes, Sir.

12        **PRESIDING COMMISSIONER BIGGERS:**  Okay.   And what

13   happened after that?

14        **INMATE PLANK:**  As far as?

15        **PRESIDING COMMISSIONER BIGGERS:**  How did you get

16   wrapped up with the mother to get involved in this

17   commitment offense?

18        **INMATE PLANK:**  She come to the bowling alley and

19   seen me one night and started talking to me.

20        **PRESIDING COMMISSIONER BIGGERS:**  Okay.   And what

21   was the thrust of that conversation?

22        **INMATE PLANK:**  Well, she told me that -- I believe

23   that she was telling me that she was wanting to get rid

24   of her daughter.

25        **PRESIDING COMMISSIONER BIGGERS:**  And what was your

26   response?

27        **INMATE PLANK:**  I guess I told her okay.

13

1          **PRESIDING COMMISSIONER BIGGERS:**   Well, I

2    understand that, but I'm trying to find out why you

3    would you would tell her fine and then help her in such

4    a way that you did.

5          **INMATE PLANK:**   I didn't really think that she

6    would kill her daughter as far as anything like that

7    goes.   I don't believe -- Even today, I still don't

8    believe that she would have killed her daughter.

9    Actually, she has.

10          **PRESIDING COMMISSIONER BIGGERS:**   But were you not

11    also upset with the daughter because of the fact -- and

12    I think that was when I read the file you were upset at

13    Ms. Jones because your boss and landlord had moved her

14    into your -- into the house and she was messy and did

15    not properly maintain the apartment or care for her

16    child.   Is that correct?

17          **INMATE PLANK:**   Yes, Sir.

18          **PRESIDING COMMISSIONER BIGGERS:**   Okay.   So, you

19    had a reason for wanting to get her out of the house,

20    too, did you not?

21          **INMATE PLANK:**   I believe I wanted her to leave,

22    yes.

23          **PRESIDING COMMISSIONER BIGGERS:**   Okay.   So, when

24    the mother started coming and talking to you about that,

25    why didn't you warn the daughter?

26          **INMATE PLANK:**   I have no idea why I did that.

27          **PRESIDING COMMISSIONER BIGGERS:**   Because it would

14

1    appear to me that if you know she was staying in the

2    house with you -- You ever try talking to the daughter

3    or you couldn't talk to her?

4        INMATE PLANK:  There was no talking to her at

5    times.

6        PRESIDING COMMISSIONER BIGGERS:  Okay, how about

7    Mr. Giles?

8        INMATE PLANK:  I tried to talk to Mr. Giles --

9        PRESIDING COMMISSIONER BIGGERS:  And he --

10       INMATE PLANK:  -- and I told him I was going to

11   leave, and he didn't want me to leave either.

12       PRESIDING COMMISSIONER BIGGERS:  Okay.  But did

13   you ever tell anybody about what the mother had done and

14   talked to you about?

15       INMATE PLANK:  No, Sir.

16       PRESIDING COMMISSIONER BIGGERS:  Okay, then why

17   did you -- You went and got a shotgun and you all talked

18   about her using a shotgun?

19       INMATE PLANK:  I believe that she was the one that

20   initiated the gun.

21       PRESIDING COMMISSIONER BIGGERS:  She got --

22       INMATE PLANK:  She's the one that talked about it

23   first.

24       PRESIDING COMMISSIONER BIGGERS:  And you got the

25   gun for her?

26       INMATE PLANK:  Yes, I did.

27       PRESIDING COMMISSIONER BIGGERS:  Where did you get

15

1    the shotgun?

2         **INMATE PLANK:**  Out of the house.

3         **PRESIDING COMMISSIONER BIGGERS:**  Out of the house.

4    Did you show her how to use it?

5         **INMATE PLANK:**  No, Sir.

6         **PRESIDING COMMISSIONER BIGGERS:**  You did not show

7    her how to use it?

8         **INMATE PLANK:**  No, Sir.

9         **PRESIDING COMMISSIONER BIGGERS:**  Now, it also

10   indicated that she made repeated threats about you.

11   What kind of threats was she doing, Ms. Groatt?  That's

12   the mother, right?

13        **INMATE PLANK:**  Yes, Sir.  I can't recall what kind

14   of threats she had made.

15        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Okay,

16   there was also in your record here that you indicated

17   that you initially got involved because Loretta Groatt,

18   G-R-O-A-T-T, coerced you into cooperating.  You said

19   that she was friendly when she first saw him at the

20   bowling alley.  That's what we talked about.  Then they

21   began to discuss killing her daughter.  She requested

22   that you bring Sherman Giles' shotgun to her and follow

23   her to the residence from the bowling alley.  And that's

24   when you said you were afraid that she would kill him if

25   he didn't cooperate.  Is that correct?

26        **INMATE PLANK:**  I believe so, yes.

27        **PRESIDING COMMISSIONER BIGGERS:**  You mean to tell

16

1    me you couldn't take that shotgun -- Well, you had a

2    shotgun in your hand, and you gave it to her, and you

3    went with her?

4         INMATE PLANK:  No, I did not go with her.

5         PRESIDING COMMISSIONER BIGGERS:  But you followed

6    her to a residence, right?

7         INMATE PLANK:  I went to the residence at a later

8    time, yes.

9         PRESIDING COMMISSIONER BIGGERS:  Well, here they

10   said they were going to discuss it.  And she requested

11   you bring the shotgun and follow her to the residence

12   from the bowling alley.  Mr. Plank said he was afraid

13   Loretta would kill him if he didn't cooperate with her.

14   He intended not to meet her at the residence but then

15   decided to when he noticed he was being followed by

16   another vehicle.  Is that correct?

17        INMATE PLANK:  Yes, Sir.

18        PRESIDING COMMISSIONER BIGGERS:  Who was in the

19   vehicle behind you?

20        INMATE PLANK:  I have no idea.

21        PRESIDING COMMISSIONER BIGGERS:  Okay.  And once

22   at Ms. Groatt's residence, she had him move a toolbox in

23   the trunk and again told him -- and again told her to

24   meet her -- meet him -- meet her with the shotgun in the

25   morning or he would be in trouble.  I thought you had

26   just given her the shotgun.

27        INMATE PLANK:  I gave her the shotgun in the

17

1    morning.

2        PRESIDING COMMISSIONER BIGGERS:   In the morning.

3        INMATE PLANK:   I did not move any toolbox in that

4    car.   I never touched that car.

5        PRESIDING COMMISSIONER BIGGERS:   Okay.   And again,

6    you didn't think she would kill her.   But you also say

7    that Ms. Groatt was angry and she would interact with

8    both you and the daughter.   And I see you say where your

9    codefendant was a damn liar and said, he did not place

10   the victim in the trunk of the car.   So, you did not

11   help her move the body?

12       INMATE PLANK:   No, Sir.

13       PRESIDING COMMISSIONER BIGGERS:   So, when you saw

14   the woman dead and again, I'm not trying to retry the

15   case here.   I'm just trying to figure out your frame of

16   mind.   When you saw the woman after she was shot, why

17   didn't you call the police?

18       INMATE PLANK:   I never seen her shot.

19       PRESIDING COMMISSIONER BIGGERS:   You never did?

20       INMATE PLANK:   No, Sir.   I was never at the scene

21   of the crime.

22       PRESIDING COMMISSIONER BIGGERS:   Never, huh?

23       INMATE PLANK:   I never did know where she took

24   her.

25       PRESIDING COMMISSIONER BIGGERS:   Why do you think

26   she indicated you help put her in the car?

27       INMATE PLANK:   I have no idea why she said that,

18

1    but it never happened.

2         PRESIDING COMMISSIONER BIGGERS:   Do you feel any

3    remorse for the victim?

4         INMATE PLANK:   Yes, Sir.

5         PRESIDING COMMISSIONER BIGGERS:   Okay.   In what

6    way?

7         INMATE PLANK:   In every way.   I participated in

8    the conversation.   I handed Loretta Groatt the shotgun

9    that eventually ended up killing her daughter.   And for

10    that, I am sorry.

11         PRESIDING COMMISSIONER BIGGERS:   That's about your

12    extent of what you were involved with in regards to what

13    they say.

14         INMATE PLANK:   I'm not trying to minimize it, Sir.

15    I was -- I was involved.   I was involved and I'm sorry.

16         PRESIDING COMMISSIONER BIGGERS:   And you did it

17    out of fear.

18         INMATE PLANK:   A lot of it, yes.

19         PRESIDING COMMISSIONER BIGGERS:   Out of fear of

20    the mother as we talked about earlier and she didn't

21    coerce you in any way.   She just told you she would do

22    something to you if you didn't cooperate.

23         INMATE PLANK:   She had a gun in her purse that I

24    found out about later on.

25         PRESIDING COMMISSIONER BIGGERS:   I'm talking about

26    prior to the incident taking place.   This was after the

27    incident took place.

19

1        **INMATE PLANK:**  Yes, Sir.

2        **PRESIDING COMMISSIONER BIGGERS:**  Prior to.

3        **INMATE PLANK:**  Yes, Sir.

4        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Now, the

5    thing that's just bugging me is why didn't you try to

6    call the police?

7        **INMATE PLANK:**  There was never a phone out there

8    at that house at the time that we lived there.

9        **PRESIDING COMMISSIONER BIGGERS:**  All right.  Now,

10   was the victim killed in the apartment?

11       **INMATE PLANK:**  No, Sir.

12       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You don't

13   know where she was killed.

14       **INMATE PLANK:**  No, Sir.

15       **PRESIDING COMMISSIONER BIGGERS:**  When they

16   arrested you, what did you feel?

17        **INMATE PLANK:**  Scared.

18       **PRESIDING COMMISSIONER BIGGERS:**  Scared.  And you

19   denied your guilt.  Is that correct?

20       **INMATE PLANK:**  Yes, Sir.

21       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  When they

22   were talking to you about that, they basically said

23   that, you know, you admitted to giving her the gun.

24       **INMATE PLANK:**  Yes, Sir.

25       **PRESIDING COMMISSIONER BIGGERS:**  And you admitted

26   to talking to her and planning it.

27       **INMATE PLANK:**  Later on, yes, Sir.

20

1   **PRESIDING COMMISSIONER BIGGERS:**   Later on.

2   **INMATE PLANK:**   Yes, Sir.

3   **PRESIDING COMMISSIONER BIGGERS:**   But you didn't do

4   it initially?

5   **INMATE PLANK:**   No, Sir.

6   **PRESIDING COMMISSIONER BIGGERS:**   Okay.   As you've

7   been locked up and incarcerated for this period of time,

8   what do you feel you could have done differently?

9   **INMATE PLANK:**   I think I could have stopped it

10   from the beginning.

11   **PRESIDING COMMISSIONER BIGGERS:**   By doing what?

12   **INMATE PLANK:**   Not handing her that gun.

13   **PRESIDING COMMISSIONER BIGGERS:**   And what else?

14   **INMATE PLANK:**   Probably calling the police.

15   **PRESIDING COMMISSIONER BIGGERS:**   And did you --

16   Did you learn that while you were in here or had you

17   just thought about that or have you ever thought about

18   the causative factors that made you go along with this

19   whole thing?

20   **INMATE PLANK:**   I don't know what I was thinking at

21   the time.   I really don't.   I'm sorry that she died,

22   though.

23   **PRESIDING COMMISSIONER BIGGERS:**   Okay.   Yeah, she

24   was a young girl of 18.   You were 24 years old at the

25   time of the crime.   Is that correct?

26   **INMATE PLANK:**   Yes, Sir.

27   **PRESIDING COMMISSIONER BIGGERS:**   How old was the

21

1    victim's mother?

2         INMATE PLANK:  I don't remember how old she was at

3    the time.

4         PRESIDING COMMISSIONER BIGGERS:  And you're 42

5    now?

6         INMATE PLANK:  Forty-three.

7         PRESIDING COMMISSIONER BIGGERS:  Forty-three.

8    Okay, do you have any questions about the crime?

9         DEPUTY COMMISSIONER MORRIS:  No.

10        PRESIDING COMMISSIONER BIGGERS:  Okay, I'm going

11   to move over to your social history.

12        DEPUTY COMMISSIONER MORRIS:  I do have one

13   question.

14        PRESIDING COMMISSIONER BIGGERS:  Okay, go ahead,

15   please.

16        DEPUTY COMMISSIONER MORRIS:  What was the plan, as

17   you understood it?

18        INMATE PLANK:  The way I understood it was that

19   she would get rid of her daughter, get her out of town,

20   get her away from Sherman because she was mad at her

21   daughter for being around him, for having sex with him,

22   and she caught her at it.  And I figure that's all she

23   would do was get rid of -- scare her daughter to get

24   gone.  I didn't really think she would kill her

25   daughter.

26        DEPUTY COMMISSIONER MORRIS:  Did you think that

27   the shotgun was going to be used to scare her?

22

1          INMATE PLANK:  To scare her with.

2          DEPUTY COMMISSIONER MORRIS:  There was no

3    discussion about securing her to a chair or --

4          INMATE PLANK:  No.

5          DEPUTY COMMISSIONER MORRIS:  -- tying her up?  How

6    did that happen?  Do you know?

7          INMATE PLANK:  I don't know how that happened.  I

8    mean that's -- When I went to the apartment or to the

9    house, she was already subdued.

10         DEPUTY COMMISSIONER MORRIS:  What does subdued

11   mean?

12         INMATE PLANK:  She was tied up.

13         DEPUTY COMMISSIONER MORRIS:  And then what did you

14   do from there?

15         INMATE PLANK:  I didn't do anything.

16         DEPUTY COMMISSIONER MORRIS:  Was the body moved?

17         INMATE PLANK:  No, Sir.  I didn't move it.

18         DEPUTY COMMISSIONER MORRIS:  What did you do then?

19         INMATE PLANK:  I didn't do anything.

20         DEPUTY COMMISSIONER MORRIS:  Well, you're here

21   now, so something happened.  You had to do something or

22   walk away or something.

23         INMATE PLANK:  I walked out of the house later on,

24   you know.  Once I seen the daughter, then I walked out

25   of the house and I walked to the back of the house.  I

26   never touched her.

27         DEPUTY COMMISSIONER MORRIS:  That's all.

23

1            **PRESIDING COMMISSIONER BIGGERS:**  Okay, I'm going

2     to go into your social history.  I just lost my spot

3     here.  You were born in Indiana in 1963 to Dorothy and

4     John Plank?

5            **INMATE PLANK:**  Yes, Sir.

6            **PRESIDING COMMISSIONER BIGGERS:**  You were raised

7     with five sisters.  Is that correct?

8            **INMATE PLANK:**  Yes, Sir.

9            **PRESIDING COMMISSIONER BIGGERS:**  Four of them were

10    older than you were.  What part of Indiana?

11           **INMATE PLANK:**  I was born in Elkhart, Indiana.

12           **PRESIDING COMMISSIONER BIGGERS:**  Elkhart, Indiana.

13    You say your childhood was unremarkable.  What did you

14    mean by that?

15           **INMATE PLANK:**  I didn't have any problems when I

16    was a kid.

17           **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And you

18    were -- According to this report that I'm looking at, it

19    says that your sister, Ms. Davis, said you were law

20    abiding and helpful to others.  Is that correct?

21           **INMATE PLANK:**  Yes, Sir.

22           **PRESIDING COMMISSIONER BIGGERS:**  You quit school

23    in the 11th grade.  Admitted to limited alcohol use and

24    some experimental -- experimentation with marijuana and

25    cocaine, but you deny substance abuse use had any impact

26    on the commission of the instant offense.  Is that

27    correct?

24

1      **INMATE PLANK:**  Yes, Sir.

2      **PRESIDING COMMISSIONER BIGGERS:**  Okay, where are

3    your sisters now?

4      **INMATE PLANK:**  They're everywhere.  I got one in I

5    believe it's North Carolina.  I have one in Washington,

6    one in Texas, one in Ohio, and where my other one is I

7    don't know.

8      **PRESIDING COMMISSIONER BIGGERS:**  Do they write to

9    you?

10      **INMATE PLANK:**  Yeah, I try to keep in touch with

11    them on the phone, too.

12      **PRESIDING COMMISSIONER BIGGERS:**  On the phone as

13    well.  Do they ever come to see you?

14      **INMATE PLANK:**  No, Sir.

15      **PRESIDING COMMISSIONER BIGGERS:**  What about your

16    mom and dad?  Are they still living?

17      **INMATE PLANK:**  My dad passed away.  My mom is in

18    an old folk's home, and my sisters are trying to take

19    care of her.

20      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm sorry

21    to hear that about your dad.  Anything else about your

22    social history that you want to get on the record or did

23    I cover it?

24      **INMATE PLANK:**  I think you covered it.  Thank you.

25      **PRESIDING COMMISSIONER BIGGERS:**  Did I miss any

26    priors because I didn't see -- I saw that you had no

27    juvenile record and this is the only crime you've ever

25

1    been convicted of.

2          **INMATE PLANK:**  Yes, Sir.

3          **PRESIDING COMMISSIONER BIGGERS:**  And that's saying

4    a lot that you would -- Well, that was a bad decision

5    that you made by not getting a hold of the police.

6          **INMATE PLANK:**  It was a bad decision on my part,

7    yes.

8          **PRESIDING COMMISSIONER BIGGERS:**  Both ways.  Once

9    when you first started talking about it, and secondly

10   when -- after you saw it happen and you knew about it,

11   you didn't tell anybody.

12         **INMATE PLANK:**  Well, you know when I was arrested,

13   the police officer asked me, he said, didn't you ever

14   watch TV?  And yes, I have.  I watched police shows.

15   People make reports on those and they don't do anything

16   with them because it's either before the crime is

17   committed, right, or it was after the crime was

18   committed.  They didn't do anything too much before and

19   they tell them, there's nothing we can do.  I see on TV

20   even today where they have a missing person that

21   somebody calls in on, and they say they can't do

22   anything for 48 hours.  Excuse me, if somebody's missing

23   in my family and I call the police to try to get help, I

24   expect to get the help, you know.  But I see this now,

25   and I see that it's the same as it was then.

26         **PRESIDING COMMISSIONER BIGGERS:**  But again, you

27   could have warned Jennifer, could you not?

26

1          **INMATE PLANK:**  I think I could have.  I think I

2    should have said something to her.

3          **PRESIDING COMMISSIONER BIGGERS:**  To her, yeah.

4          **INMATE PLANK:**  But I didn't.

5          **PRESIDING COMMISSIONER BIGGERS:**  That way she

6    could have probably been a little not as vulnerable when

7    her mother came over to see her.  She could have put up

8    her defenses as well.

9          **INMATE PLANK:**  Yes, Sir.

10          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm going

11    to ask the Deputy Commissioner, if he doesn't have any

12    additional questions, will he go into the post

13    conviction factors, Sir.

14          **DEPUTY COMMISSIONER MORRIS:**  Okay, Mr. Plank, this

15    is your fifth Parole Consideration Hearing, and it looks

16    like your last face-to-face hearing was December 17 of

17    '02.  And at that time, you suffered a two-year denial.

18    And there was another hearing scheduled March -- April

19    28 of '05, and you stipulated for a year denial at that

20    time, okay.  And why was that?

21          **INMATE PLANK:**  I believe that the Parole Board

22    took a one-year denial because they didn't have an

23    updated psych report at that time.

24          **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, I noticed

25    that -- I see your Classification Score is 19, and of

26    course, that's as low as your life crime will allow.

27    Let me check the gang sheet here, the A12.  The A12 is

27

1    clear.  You came to prison at about 24?

2          **INMATE PLANK:**  Yes, Sir.

3          **DEPUTY COMMISSIONER MORRIS:**  Okay.  I see no gang

4    affiliation and no enemies.  How did you do that?

5          **INMATE PLANK:**  I try to get along with everybody

6    as best as I can.

7          **DEPUTY COMMISSIONER MORRIS:**  No problems -- No

8    real problems in the institution?

9          **INMATE PLANK:**  No, Sir.

10         **DEPUTY COMMISSIONER MORRIS:**  With inmates or

11   staff --

12         **INMATE PLANK:**  No, Sir.

13         **DEPUTY COMMISSIONER MORRIS:**  -- it looks like.

14   Okay, I'm looking at -- I'm looking at a disciplinary

15   record and I see in about 16 years you've had one

16   serious disciplinary and that's out of bounds?

17         **INMATE PLANK:**  Yes, Sir.

18         **DEPUTY COMMISSIONER MORRIS:**  And I'm looking at

19   five negative chronos.  Two of them had to do with

20   smoking, missing tools.  Three of them had to do with

21   smoking and one for missing tool chit, so not the tool

22   itself, but the chit to check it out.

23         **INMATE PLANK:**  Right.

24         **DEPUTY COMMISSIONER MORRIS:**  How did you do that?

25         **INMATE PLANK:**  I happened to have it in my pocket

26   and it even got through the metal detector somehow.

27         **DEPUTY COMMISSIONER MORRIS:**  Okay.

28

1       **INMATE PLANK:** And when I realized it, then I

2    informed the officer that I had them and I would like to

3    take them back to work, and give them back to my

4    supervisor. And he said that he would take care of

5    that, and that's when they wrote that on.

6       **DEPUTY COMMISSIONER MORRIS:** Okay. And then

7    9/15/05, you received this negative chrono for it says

8    obeying orders. I've got violation of smoking policy

9    for that one as well. What was that about? Disobeying

10   orders, that chrono?

11      **INMATE PLANK:** Yes, Sir. That was my supervisor

12   at textiles said that I had taken tools in before the

13   tool bell rang.

14      **DEPUTY COMMISSIONER MORRIS:** Okay.

15      **INMATE PLANK:** And I did not do that, and I

16   informed her I did not do that. And she accused me of

17   it again and told me she was going to write me up for

18   it, and that's when I decided being a mechanic around

19   there was not going to be a future for me.

20      **DEPUTY COMMISSIONER MORRIS:** So, it has something

21   to do with checking out tools at the wrong time?

22      **INMATE PLANK:** Bringing in a tool from somebody,

23   yes.

24      **DEPUTY COMMISSIONER MORRIS:** Okay. I wrote down

25   the wrong thing regarding that. Okay. Now, I see that

26   you've taken the Adult Basic Education Test, and I see a

27   chrono or a GED document dated May 25 of 1999.

29

1        **INMATE PLANK:**  Yes, Sir.

2        **DEPUTY COMMISSIONER MORRIS:**  So, you were

3    successful with that.

4        **INMATE PLANK:**  Yes, Sir.

5        **DEPUTY COMMISSIONER MORRIS:**  Okay.  How long did

6    it take you to do that?  You came to prison in '88.  Did

7    you prepare that for a while and go through ABE One, ABE

8    Two?

9        **INMATE PLANK:**  I did go into that, but I did that

10   after I went and got my vocation in Upholstery.

11       **DEPUTY COMMISSIONER MORRIS:**  So, you got the

12   vocation before -- before you --

13       **INMATE PLANK:**  Got my GED.

14       **DEPUTY COMMISSIONER MORRIS:**  That's what you did?

15       **INMATE PLANK:**  Yes, Sir.

16       **DEPUTY COMMISSIONER MORRIS:**  How were you able to

17   do that?  That was kind of backwards.

18       **INMATE PLANK:**  Well, yeah.  They assigned me to a

19   job and the job was in vocation.

20       **DEPUTY COMMISSIONER MORRIS:**  Okay.

21       **INMATE PLANK:**  All right, so I went ahead and took

22   upholstery.  And when I got that done, I went back to

23   school.  You know I've just been letting -- Well, I was

24   in Upholstery, to go back to school --

25       **DEPUTY COMMISSIONER MORRIS:**  Okay.

26       **INMATE PLANK:**  -- get my GED and I'm very proud of

27   that.

30

1     **DEPUTY COMMISSIONER MORRIS:**  So, before you --

2    before 1999, you had taken the TABE Test before?  You

3    must have scored above 6.0 in order to get into the

4    vocation class.

5     **INMATE PLANK:**  Yes, Sir.

6     **DEPUTY COMMISSIONER MORRIS:**  Isn't that the

7    minimum requirement, a 6.0?

8     **INMATE PLANK:**  It was åt that time.

9     **DEPUTY COMMISSIONER MORRIS:**  Okay.  At any rate,

10   you did that and you completed -- I see you completed

11   Vocational Upholstery in '97.

12     **INMATE PLANK:**  Yes, Sir.

13     **DEPUTY COMMISSIONER MORRIS:**  I also see a

14   Vocational Machine Repair in the Board report.  It talks

15   about a completion of that, but I don't see a

16   certificate here about that Machine Repair.  What year

17   did you do that -- did you complete that course?

18     **INMATE PLANK:**  I have been in that class a couple

19   of times.  It was actually I started in Textiles in late

20   '80s, early '90s when I went to work there.  I started

21   becoming a Sewing Machine Mechanic Repairman there, and

22   then I did it again.  When I went to -- When I went back

23   out to Textiles again, I went back into to Sewing

24   Machine Repair, and I was repairing the sewing machines

25   there.  And now I work in Upholstery Shop at PIA as a

26   Sewing Machine Repair -- Sewing Machine Repair, and an

27   Upholsterer, and a Sewing Machine Operator.

1      **DEPUTY COMMISSIONER MORRIS:**  Right, all of that.
2   Okay, so I'm still not hearing when you got your
3   certification for that.  Was there any kind of a
4   certification or was this just a PIA skill that you
5   picked up along the way?
6      **INMATE PLANK:**  Well, it's a PIA skill, but they
7   also give a certificate in it and I'm waiting to get
8   that.
9      **DEPUTY COMMISSIONER MORRIS:**  Okay.  That's why I
10  don't see it here.
11     **INMATE PLANK:**  Yes, Sir.
12     **DEPUTY COMMISSIONER MORRIS:**  Okay.  But you got a
13  lot of work in PIA I see, so that tells me that your
14  skills are sufficient to be in PIA.  PIA does not take
15  just everyone.
16     **INMATE PLANK:**  No, Sir.
17     **DEPUTY COMMISSIONER MORRIS:**  Okay.  How many years
18  have you worked for PIA?
19     **INMATE PLANK:**  I believe a total of about five or
20  six years.
21     **DEPUTY COMMISSIONER MORRIS:**  Yeah, okay.  All
22  right.  Yeah, I'm thinking the only -- the only job
23  around the institution that is more restrictive is
24  Inmate Day Labor.
25     **INMATE PLANK:**  IDO.
26     **DEPUTY COMMISSIONER MORRIS:**  Yeah.
27     **INMATE PLANK:**  Yes, Sir.

32

1       **DEPUTY COMMISSIONER MORRIS:** Yeah, PIA is right

2   behind that, so you've got to be doing a pretty good

3   job.

4       **INMATE PLANK:** Yes, Sir.

5       **DEPUTY COMMISSIONER MORRIS:** I also see that

6   you've also worked as a Clerk.

7       **INMATE PLANK:** Yes, Sir.

8       **DEPUTY COMMISSIONER MORRIS:** Okay. Any other work

9   around the institution at the convenience of the

10  institution?

11      **INMATE PLANK:** As far as having a little computer

12  knowledge working as a Clerk, no.

13      **DEPUTY COMMISSIONER MORRIS:** Okay. All right.

14  Now, I also see something here about additional skills.

15  It's talking about skills. I saw something about

16  computer skills. Where did you -- Where did you learn

17  that and how would you rate yourself in terms of

18  saleable skill?

19      **INMATE PLANK:** As far as?

20      **DEPUTY COMMISSIONER MORRIS:** Go out in the

21  community and get a job with those computer skills?

22      **INMATE PLANK:** With those computer skills, I don't

23  know how to program a computer, but I do know how to run

24  the program that's in a computer.

25      **DEPUTY COMMISSIONER MORRIS:** Okay.

26      **INMATE PLANK:** I think I can get around with no

27  problem at all.

33

1        **DEPUTY COMMISSIONER MORRIS:**  Okay, so you've got

2   some limited skills with that?

3        **INMATE PLANK:**  Yes, Sir.

4        **DEPUTY COMMISSIONER MORRIS:**  Okay.  And you have a

5   certification for Upholstery and the Voc Machine Repair

6   is pending.

7        **INMATE PLANK:**  Yes, Sir.

8        **DEPUTY COMMISSIONER MORRIS:**  Completed but

9   pending, okay.  I'm going to say with cert.  Now, I saw

10  something about back in 1992 about Total Quality

11  Management.  There again, that's something through PIA.

12  What's that about?

13       **INMATE PLANK:**  That is where you can -- you look

14  at what is going to go out, the product that's going to

15  go out.  You make sure that there's no flaws in that

16  product.  There's no scratches in the wood.  There's no

17  rips in the material.

18       **DEPUTY COMMISSIONER MORRIS:**  Okay, quality

19  control.

20       **INMATE PLANK:**  Quality control.

21       **DEPUTY COMMISSIONER MORRIS:**  Okay.  All right.

22  And you worked -- How long did it take you to earn that

23  kind of a certification from PIA?

24       **INMATE PLANK:**  We went to a class.  I believe it

25  was a two-day class on that.

26       **DEPUTY COMMISSIONER MORRIS:**  Okay, so those are

27  skills that would also be saleable in manufacturing,

34

1    especially furniture manufacturing --

2            INMATE PLANK:  Yes, Sir.

3            DEPUTY COMMISSIONER MORRIS:  -- in the area of

4    quality control and that kind of thing.  Okay.  Let's

5    talk --

6            INMATE PLANK:  I apply it to everything I do even

7    to Sewing Machine Repair.  I don't use a half used part

8    on the machine because I know I'm going to have to come

9    right back again and fix that one.  So, I always turn

10   around, and turn those in, and get new parts, and put

11   new parts in them.  They last longer.

12           DEPUTY COMMISSIONER MORRIS:  And with one time,

13   get maximum life out of it.

14           INMATE PLANK:  As much as I can.

15           DEPUTY COMMISSIONER MORRIS:  Okay.  Self-help,

16   you've talked about -- I've heard you talk about some of

17   this limited marijuana and cocaine use.  That takes me

18   right to issues of self-help.  I see you have

19   participated in AA.

20           INMATE PLANK:  Yes, Sir.

21           DEPUTY COMMISSIONER MORRIS:  But I haven't been

22   really able to lock that down.  When did you participate

23   in AA last?

24           INMATE PLANK:  I'm still in that class.

25           DEPUTY COMMISSIONER MORRIS:  Okay.  Now, I see --

26   Maybe I can, too.  Here's a chrono dated 4/1/2006, AA in

27   '06.

35

1 **INMATE PLANK:** Yes, Sir.

2 **DEPUTY COMMISSIONER MORRIS:** All right. So, how

3 many -- How many years have you participated in AA?

4 **INMATE PLANK:** Oh man.

5 **DEPUTY COMMISSIONER MORRIS:** '06. I see '05.

6 **INMATE PLANK:** A number of years.

7 **DEPUTY COMMISSIONER MORRIS:** I see '05. Did you

8 participate in '04? I see '04. Any '03?

9 **INMATE PLANK:** I stepped out of it there for a

10 minute. I stepped out of AA for a while.

11 **DEPUTY COMMISSIONER MORRIS:** I see self-help

12 Impact --

13 **INMATE PLANK:** Yes, Sir.

14 **DEPUTY COMMISSIONER MORRIS:** -- in '02. So, this

15 must be that break period you're talking about. So, '04

16 to '06 you participated. Did you learn anything?

17 **INMATE PLANK:** I've learned a lot.

18 **DEPUTY COMMISSIONER MORRIS:** About the Twelve

19 Steps?

20 **INMATE PLANK:** I've learned a lot about them.

21 **DEPUTY COMMISSIONER MORRIS:** What's Step Eight?

22 **INMATE PLANK:** Make a list of people that I have

23 harmed and become willing to make amends to them all.

24 **DEPUTY COMMISSIONER MORRIS:** What's Step Nine?

25 **INMATE PLANK:** Make amends to those that I can.

26 **DEPUTY COMMISSIONER MORRIS:** I think -- I think

27 that was Step Nine you said first. Step Eight is --

36

1    **INMATE PLANK:**  Step Eight is make a list of people
2    that I have harmed --

3    **DEPUTY COMMISSIONER MORRIS:**  Okay.

4    **INMATE PLANK:**  -- and become willing to make
5    amends to them all.  Step Nine is make amends to those
6    that I can except when to do so would injure them or
7    others.

8    **DEPUTY COMMISSIONER MORRIS:**  All right.  So,
9    you've done a pretty good job of that.  Let me just talk
10   to you about laudatories.  I see a lot of laudatories in
11   your file here, multiple laudatories having to do
12   with -- Most of these laudatories have to do with AA.
13   Multiple laudatories in '04.  Multiple laudatories in
14   '05.  It looks like about four or five in '05.  In '06,
15   I see a laudatory for a two-hour video regarding
16   Community Reentry.  In '05 and '06, I see this three-
17   hour video regarding Employability.

18   **INMATE PLANK:**  Yes, Sir.

19   **DEPUTY COMMISSIONER MORRIS:**  So, you've done that
20   twice.  Here's another one, 4/12 of '06, on Twelve Step
21   Principles.  That's the one we just talked about a few
22   minutes ago.  I also see a chrono dated 10/25 of '05
23   from PIA, and it talks about what you've done in the
24   Fabric -- what is it, Fabric Enterprise or something
25   with fabric?

26   **INMATE PLANK:**  In Textiles?

27   **DEPUTY COMMISSIONER MORRIS:**  Yes.  Sincere

37

1    appreciation for your dedication, support, and hard work

2    in Prison Industry Authority's Fabric Enterprise.  You

3    have attained -- have achieved more than 700,000 in

4    production level with no past due orders for the month

5    of September 2005.

6         **INMATE PLANK:**  Yes, Sir.

7         **DEPUTY COMMISSIONER MORRIS:**  You're making money

8    for PIA.

9         **INMATE PLANK:**  Every day.

10         **DEPUTY COMMISSIONER MORRIS:**  Okay.  All right, any

11    other laudatories that I need to talk about?

12         **INMATE PLANK:**  Not at this time.

13         **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, let me

14    just talk about this psych report.  There's a psych

15    report dated July 3rd of '06, authored by Macomber.  And

16    I'm just going to speak to parts of it.  Under section

17    seven, he talks about -- that second paragraph, he talks

18    about that brief experimentation period that you talked

19    about as a teenager with drugs.  At the end of that

20    section -- At the end of section seven under Current

21    Diagnostic Impressions, AXIS I:  He describes you as

22    having No Mental Disorder.  AXIS II:  He sees you as No

23    Personality Disorder.  AXIS III:  He states there's No

24    Physical Disorder.  Under AXIS IV:  Life Term

25    Incarceration, and that of course has to do with the

26    life crime.  And then under AXIS IV (verbatim):  He

27    talks about the Global Assessment of Functioning Test

38

1    and you've got a GAF Score of 90.  Under section 14,
2    Assessment of Dangerousness, he speaks specifically to
3    the level of dangerousness as it relates to institution
4    behavior, and he states that you have never been
5    involved in any serious disciplinaries involving
6    violence, possession of weapons, assaults on others, or
7    other dangerous behavior.  You only have one
8    disciplinary in 1992 for being out of bounds during
9    count.  Going to the last sentence in that paragraph, he
10   states that Mr. Plank demonstrates good control -- good
11   self-control, maturity and responsibility.  In
12   comparison to other inmates, potential for dangerous
13   behavior is below average.  Paragraph B, in this
14   paragraph he talks about level of dangerousness should
15   you be released to the community.  He goes on to say --
16   the psychologist continues by saying that, I agree with
17   the prior evaluator that has stated that he poses a
18   below average potential for dangerous behavior in
19   comparison to the average citizen in the community.
20   And then skipping down a couple sentences, this
21   conclusion is supported by the administration of the
22   level of service inventory testing tools.  Skipping down
23   another couple of sentences he states that:  where

24       "You obtained a score of 0.4 cumulative
25       frequency for community offenders.  You also
26       obtained a score of 0.8 cumulative frequency
27       for prison inmates.  This score means that

39

1          if 100 men were released on parole, you

2          would be expected to do better than 99 of

3          them.  This is an extremely low risk level.

4          Mr. Plank does not pose any more risk to

5          society than the average citizen.  And based

6          upon his life experiences, maturity, and

7          growth, he poses less risk to society than

8          the average citizen in the community."

9     And in paragraph C, he continues by saying, there are no

10    significant risk factors in this case.  Under section

11    15, Clinical Observations and Recommendations, the last

12    sentence Macomber closes out by saying, the prognosis

13    for successful adjustment in the community is excellent.

14    These are just some excerpts from the evaluation dated

15    7/3 of '06.  Having heard that, do you take exception to

16    any part of that, you or Counsel?  Is there anything

17    else you care to add to that evaluation?

18         **INMATE PLANK:**  No, there's nothing more I'd like

19    to add to it.

20         **DEPUTY COMMISSIONER MORRIS:**  Okay.  All right,

21    anything else you need to share with this side of the

22    table regarding post conviction factors?  Anything that

23    will serve you well that we have not talked about?  Just

24    about what you've done.

25         **INMATE PLANK:**  That pretty much covers everything

26    that I've done so far, and I'm always willing to get

27    into anything else that I can.

40

1        **DEPUTY COMMISSIONER MORRIS:**  All right, absent

2    additional testimony specific to post conviction

3    factors, I yield to the Chair.

4        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  All right,

5    let's talk about your parole plans now.  I see that you

6    want to reside with a friend, Mike Scalase.

7        **INMATE PLANK:**  Mike Scalase.

8        **PRESIDING COMMISSIONER BIGGERS:**  Scalase, okay.

9    And that's S-C-A-L-A-S-E.  He lives in Santa Rosa,

10    California.  And you said that you could stay with him

11    as long as it takes for you to secure an apartment on

12    your own.

13        **INMATE PLANK:**  Yes, Sir.

14        **PRESIDING COMMISSIONER BIGGERS:**  You have a pay

15    number here.  Do you have any money saved?

16        **INMATE PLANK:**  I have been saving money up, yes.

17        **PRESIDING COMMISSIONER BIGGERS:**  About how much

18    money do you have?

19        **INMATE PLANK:**  I probably have just a little over

20    100 bucks right now.

21        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

22        **INMATE PLANK:**  They're taking out of my pay for

23    restitution, so it's, you know, I'm pretty much limited

24    to how much I can save.

25        **PRESIDING COMMISSIONER BIGGERS:**  And I'm going to

26    diverse for just a minute.  What ever happened to your

27    codefendant?

41

1          **INMATE PLANK:**  I don't know.

2          **PRESIDING COMMISSIONER BIGGERS:**  Is she serving

3    time?

4          **INMATE PLANK:**  She's in prison.

5          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  It says

6    here for employment you're going to be working for

7    Mackagori (phonetic) and Chiladi (phonetic), but I don't

8    see a letter from them.

9          **INMATE PLANK:**  No, Sir.  That was -- The last time

10   I come up they said that they won't actually send a

11   letter unless I join the union first.  And I don't have

12   the money to join the union right off the bat like that.

13         **PRESIDING COMMISSIONER BIGGERS:**  Did you write any

14   other companies?  I see you've written a lot of job

15   placement and this is one of the things that your

16   counselor gave you.

17         **INMATE PLANK:**  Yes, Sir.

18         **PRESIDING COMMISSIONER BIGGERS:**  And these are

19   primarily to jobs and employment training services in

20   San Bernardino and EDD.  Is that correct?

21         **INMATE PLANK:**  Yes, Sir.

22         **PRESIDING COMMISSIONER BIGGERS:**  Okay, and you got

23   some limited response back.

24         **INMATE PLANK:**  Just very limited.  Yes, Sir.

25         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I think

26   that the gentleman that you're going to be living with,

27   have you asked him to assist you in any way in getting

42

1    some job offers?

2        **INMATE PLANK:**  Right now he is busy taking care of

3    his mother who has Alzheimer's and his wife who has

4    breast cancer, so --

5        **PRESIDING COMMISSIONER BIGGERS:**  He doesn't have

6    the time.

7        **INMATE PLANK:**  Yeah, that's going to be kind of

8    limited.  I don't want to be a burden on him or anybody

9    else.

10        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And I saw

11    when I went back and was checking your parole plans

12    previously you indicated and I see a letter here that

13    you don't have -- unfortunately you do not have any

14    family or friends in California to turn to for

15    assistance.  Is that correct?

16        **INMATE PLANK:**  Yes, Sir.

17        **PRESIDING COMMISSIONER BIGGERS:**  And have you --

18    Is this gentleman the only one person you know here in

19    California?

20        **INMATE PLANK:**  Right now, yes.

21        **PRESIDING COMMISSIONER BIGGERS:**  All right, I'm

22    going to go over to your support letters.  I saw a

23    support letter here from your sister.  Is that correct?

24        **INMATE PLANK:**  Yes, Sir.

25        **PRESIDING COMMISSIONER BIGGERS:**  And her name

26    is -- Let me just get the letter.  That's the only one

27    you have.  Is that right?

43

1      **INMATE PLANK:**  There should be some support

2    letters even from my mother at one time before she ended

3    up in a --

4      **PRESIDING COMMISSIONER BIGGERS:**  Yeah.  I'm

5    talking about recent letters.

6      **INMATE PLANK:**  Recent, no.

7      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  There's

8    not a date on this letter that I received here that I

9    have here in my packet.  It's from a Pamela Fletcher.

10    That's F-L-E-T-C-H-E-R.

11      **INMATE PLANK:**  Yes, Sir.

12      **PRESIDING COMMISSIONER BIGGERS:**  And she says my

13    name is Pamela Fletcher and I am Roger Plank's sister.

14    She's writing on behalf of the Plank family.

15          "First and foremost, I want to say how much

16          we all love and miss him.  We all know what

17          you did was wrong.  We feel that he should

18          be able to have another chance.  He had

19          never been in trouble before.  He was and is

20          a hard worker and always contributed to his

21          family's welfare."

22    It indicates what you did in the past would never

23    change.  And they asked us to give you a chance and find

24    you suitable.  They will also help you with job -- help

25    you find a job and transportation, anything that you

26    would need so that you can get back on his feet and he

27    has a home here.  And this is -- And she lives where?

44

1        **INMATE PLANK:**  Tennessee.

2        **PRESIDING COMMISSIONER BIGGERS:**  Tennessee.  And

3    she thanks us for taking time to read the letter and

4    wanted you to know that they all love you.  Counselor,

5    do you have any other letters?

6        **ATTORNEY CHRISTENSEN:**  No, that's all that we

7    have.  As you can see from the list that he submitted,

8    he's trying to reach out --

9        **PRESIDING COMMISSIONER BIGGERS:**  He's trying to

10   reach out to other people.

11       **ATTORNEY CHRISTENSEN:**  -- for housing.

12       **PRESIDING COMMISSIONER BIGGERS:**  All right.  We

13   send out 3042 Notices and that's to law enforcement.

14   And we have a representative from the DA here, but I

15   also received a letter from -- that's dated March the

16   2nd, 2005, and it's from the San Bernardino County

17   Sheriff's Department.  And it was written for your last

18   Board report, and I think it's because it was cancelled

19   or postponed.  Is that correct?

20       **INMATE PLANK:**  Yes, Sir.

21       **PRESIDING COMMISSIONER BIGGERS:**  That would make

22   this one still good.  It would indicate that on April --

23   It says:

24            "Thank you for the opportunity to have input

25            into life prisoner's Subsequent Parole

26            Hearing for Roger Plank scheduled for April

27            28th, 2005.  On April the 2nd, 1987, Roger

45

1    Plank conspired with Loretta Groatt,

2    G-R-O-A-T-T, to kidnap Groatt's daughter,

3    18-year-old Jennifer Jones, from her home.

4    After Jones was kidnapped, she was bound,

5    gagged, and driven to a remote desert

6    location where she was shot and her body was

7    dropped into an abandoned mine shaft.  Both

8    Plank and Groatt conspired together in the

9    planning and commission of Jones murder and

10   they disposed of evidence in an attempt to

11   avoid arrest and conviction.  Due to the

12   viciousness and cold-blooded nature of the

13   murder, it is the position of this

14   department that Plank serve the maximum

15   possible sentence for his conviction.  If I

16   can be of any further service, please do not

17   hesitate to call."

18   That's Thomas Neely, Lieutenant, Specialized

19   Investigative Unit, the County of -- San Bernardino

20   County Sheriff's Department.  We also have a

21   representative from the San Bernardino District

22   Attorney's Office who will be speaking at a later time.

23   With that, I'm going to ask the District Attorney if she

24   has any questions for the inmate.

25       **DEPUTY DISTRICT ATTORNEY DAWSON:**  Yes, I would ask

26   the Chair if we could inquire into blindfolds and

27   headphones.

46

1      **PRESIDING COMMISSIONER BIGGERS:**  Do you understand
2      the question, sir?

3      **INMATE PLANK:**  Yes, Sir.

4      **PRESIDING COMMISSIONER BIGGERS:**  Okay, could you
5      please answer that.

6      **INMATE PLANK:**  I did not place any headphones on
7      her.  I did not place any bandana or eye covering or
8      anything else on her.  I handed the mother the shotgun
9      and participated in the conversations with her.  And for
10     that, I'm sorry.

11     **DEPUTY DISTRICT ATTORNEY DAWSON:**  I would like to
12     ask about the purchase of gasoline afterwards to destroy
13     evidence.

14     **PRESIDING COMMISSIONER BIGGERS:**  Sir.

15     **INMATE PLANK:**  I don't know if I got the gasoline
16     or where it actually came from, but, yes, I did try to
17     destroy the evidence.

18     **DEPUTY DISTRICT ATTORNEY DAWSON:**  Nothing further.

19     **PRESIDING COMMISSIONER BIGGERS:**  Okay.

20     Ms. Christensen?

21     **ATTORNEY CHRISTENSEN:**  I have no questions.

22     **PRESIDING COMMISSIONER BIGGERS:**  Okay, then I
23     would ask the District Attorney to close, please.

24     **DEPUTY DISTRICT ATTORNEY DAWSON:**  Thank you.  I'm
25     going to use some of -- Supervisor Daley Roth, who was
26     the Deputy District Attorney that did this case, says
27     that he finds that the inmate wants to revise history

47

1    and convince the Board that he helped commit the murder
2    out of fear for his own life or out of ignorance for his
3    crime partner's murderous intentions, and both of these
4    are false.  He helped carry it out.  He advised the
5    codefendant, Ms. Groatt, the locations of the empty,
6    uninhabited, unused mines, the location that would be
7    great for her to kill her daughter at.  He provided
8    the -- In telling the officer, he told him how he moved
9    the toolbox in the trunk of the car so that the --
10   Ms. Groatt could force her -- put her daughter in the
11   trunk.  He also told her that -- He taught her how to do
12   a noose around Jennifer's neck.  He told her to shoot
13   her -- don't just shoot her once, shoot her twice for
14   me, and bring me back the shells.  He knew that the date
15   of the murder was the victim's birthday, so he wanted to
16   sing her happy birthday before her mother took her off
17   to kill her.  I don't know that you could get any more
18   callous than this was.  And it's all because she was not
19   a good housekeeper and she let her daughter make too
20   much noise at night.  I know the doctor again says that
21   he's admitted or accepts responsibility, but everything
22   that he's done since he did the initial interview has
23   been to minimize and to deny that he did anything other
24   than gave her the gun and that he's remorseful and
25   shocked that she actually killed her when he went
26   through great details of explaining how to do things and
27   to burn the clothes and the other evidence so that no

1    one could find who had done the murder.  I still feel
2    that, with this minimizing and everything else, that
3    just makes him too big of a danger for society.
4         **PRESIDING COMMISSIONER BIGGERS:**  Okay,
5    Ms. Christensen.

6         **ATTORNEY CHRISTENSEN:**  Mr. Plank is an excellent
7    candidate for parole.  I just want to start out by
8    saying he does not minimize what he did.  He fully
9    admits his responsibility in this crime, and this was a
10   very odd crime.  And it's extremely unusual for a mother
11   to kill her own daughter, so for -- It's reasonable for
12   someone to think that a mother really would not do that.
13   So, perhaps Mr. Plank -- Well, not perhaps.  Mr. Plank
14   was participating in these conversations and talking
15   with her about it, but I don't think it's at all
16   unreasonable that he really didn't think that she would
17   do it.  Be that as it may, there's nothing in his
18   history to indicate that he is at all criminally
19   inclined.  This is a man with no prior criminal history,
20   nothing as a juvenile, nothing as an adult.  There were
21   no problems in his background at all.  This has to be a
22   one-time event, not at all likely to reoccur because
23   this was uncharacteristic behavior for him.  Now, ever
24   since Mr. Plank arrived at prison, he's been extremely
25   diligent in applying himself and using all of the
26   resources here to improve himself, and he has done that
27   in a very admiral way.  He has attained not one but two

49

1     vocations.  He's highly skilled in PIA and all of the

2     other work experience that he has, and it's really

3     refreshing to hear an inmate actually know the Twelve

4     Steps.  Even more remarkable, an inmate who doesn't even

5     have an alcohol and drug problem but is serious about

6     taking self-help to the extent that he does not merely

7     sit there and take up space on this planet but actually

8     absorbs the material and is able to retain it.  So,

9     Mr. Plank is someone who follows through with everything

10    that he commits to doing in here in prison.  Every self-

11    help group, every vocational opportunity that presents

12    itself, he gives 100 percent because that's the kind of

13    person he is.  Now, it would be great if he came before

14    you today and said here is a residence offer, here is a

15    job offer.  Unfortunately, not all inmates have someone

16    here in California able to offer those types of things,

17    but Mr. Plank has reached out to the community and has

18    tried to obtain assistance to the very best of his

19    ability to find work and to find housing.  I don't

20    believe that Mr. Plank will have any trouble whatsoever

21    in finding a job, and not just any job, but a good well-

22    paying one because he has a very strong work ethic and

23    he has a lot to offer.  In terms of employment, he can

24    be in a halfway house.  And I think he would do

25    beautifully on parole.  I'm in complete agreement with

26    what Dr. Macomber has said.  His report is very

27    supportive of release.  He shown by what he's done in

50

1    here that he can comply with everything that's required
2    of him and more.  And I know that out on the street he
3    will continue to do things the right way.  He made a
4    terrible mistake in involving himself in this crime.  He
5    has learned from it, and it will not happen again.  He
6    has a very good attitude.  He gets along with everyone
7    in here.  He certainly knows right from wrong and can
8    make good decisions.  And today he knows that he will
9    not ever involve himself in any type of criminal
10   behavior.  Mr. Plank would be a success on parole.  I
11   truly believe that, and I hope this Panel agrees with
12   me.  Thank you.

13        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.
14   Mr. Plank, you have the opportunity to tell this Panel
15   why you feel you are suitable for parole, sir.

16        **INMATE PLANK:**  Okay.  I'll always live with the
17   tragic death of Jennifer Jones on my conscience.  Since
18   the loss of my own father and my niece, I appreciate
19   even more the loss of a loved one and the tragic impact
20   it has on the family as well as individual members.  It
21   is established that I have no prison record whatsoever.
22   This crime is a result of a memory loss of good judgment
23   on my part.  I was young man and not overly mature.
24   Since that time, I've had the opportunity to mature and
25   to gain insight into what allowed me to let someone else
26   override my moral upbringing my parents raised me by.
27   My record reflects that I have upgraded my education.

51

1   Vocation certificates established that I've taken

2   further employability seriously.  Also, I have over the

3   years participated in numerous self-help groups.  My

4   self-help has only been limited due to institutional

5   availabilities.  My disciplinary record is minimal, one

6   CDC 115, 14 years ago for being out of bounds and some

7   128s for minor infractions.  Please understand my family

8   loves me unconditionally.  The fact remains that they

9   are disillusioned by the entire parole hearing process.

10  They feel their previous letters have had no positive

11  impact whatsoever.  I am aware that my confidential file

12  contains the hearing transcripts of Loretta Groatt.  I'm

13  not allowed to examine them.  It is important to me that

14  this Panel understands and acknowledges the possibility

15  statements made by her in her mental state will probably

16  conflict with statement I have made.  I have been honest

17  and forthright.  I'm not in any position to protect

18  myself from any possible statement made by her that

19  deflect from all that I have accomplished.  I have -- I

20  must rely on this Panel to seek and establish the depth

21  of my sincerity, remorse, and honesty.  I have waited

22  for this hearing and I have spoken from my heart.  All

23  that has been discussed today marks the loss again of a

24  young woman's life, Jennifer Jones.  Her life wasn't in

25  vein.  I have become a far better human being, which

26  means that even in death she gives me the precious gift.

27  I have not abused that gift in any way.  My freedom is

52

1    in your hands.  I'm worthy of any and all consideration

2    for parole suitability.  Thank you for allowing me the

3    opportunity to express my heartfelt feelings into the

4    record that is available for anyone to review.

5            PRESIDING COMMISSIONER BIGGERS:  All right, thank

6    you, sir.  We'll go into deliberations at this point.

7                        R E C E S S

8                        --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

53

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **PRESIDING COMMISSIONER BIGGERS:**  I'm ready.

4          **DEPUTY COMMISSIONER MORRIS:**  Okay, we're back on

5    record.

6          **PRESIDING COMMISSIONER BIGGERS:**  Let the record

7    reflect that everyone that was in the room when we went

8    into deliberations are now back in the room.  I need to

9    make a clarification before I get started on the

10   decision.  I did find a letter in the file from the

11   Sheriff in the County of San Bernardino.  Initially, I

12   said that the letter was in 2005 and I found (inaudible)

13   a 2006 letter as well, so I just want to get that on the

14   record along with the training certifications for --

15   that have already been discussed, training

16   certifications for Mr. Plank.  And I think they were

17   covered also in the upholstery shop letters, etcetera.

18   And all of the other ones in there to include --

19         **DEPUTY COMMISSIONER MORRIS:**  That was covered.

20         **PRESIDING COMMISSIONER BIGGERS:**  -- Anger

21   Management, etcetera.  And I also before I get started

22   on the decision, Mr. Plank, this is a very difficult

23   decision for us today because there is so much

24   information that we went over to try to make some sense

25   out of what your version of the story is as compared to

26   what's in the record.  And I will go into that in detail

27   **ROGER PLANK**    **D-75871**    **DECISION PAGE 1**    **8/9/06**

54

1    here very shortly.  We have reviewed all the information
2    and from public and relied on the following
3    circumstances in concluding that the prisoner is not
4    suitable for parole and would pose an unreasonable risk
5    of danger to society or a threat to public safety if
6    released from prison.  We've looked at the offense.  And
7    as I said before, the stories -- We have to rely on
8    what's in the packet.  You pled guilty to this crime.
9    The crime was a very especially cruel, callous, cold-
10   blooded crime where an 18-year-old girl lost her life.
11   You conspired with her mother when she came and talked
12   to you about that and that to the point that you even
13   gave her the shotgun to go to use wherever she was going
14   to do it with it, as well as, and again I'm going
15   strictly from the record here, that there were
16   indications that you showed her how to tie a knot, that
17   you also participated in more than what you have told us
18   today, and what you have told any Board about your
19   participation.  And until such time as we can feel
20   comfortable on this side of believing what your saying
21   as compared to the evidence that is show here in this
22   plea bargain as well as all of the other statements that
23   have been made, it's going to be very difficult for us
24   to give you a date.  The murder itself was done in an
25   especially cruel and cold-hearted manner.  It was done
26   in a way which demonstrated an exceptionally callous
27   **ROGER PLANK     D-75871     DECISION PAGE 2     8/9/06**

1   disregard for human suffering in that the 18-year-old
2   was bound and gagged and was taken to a place where she
3   was shot and then put into this shaft.  There was
4   indications in the record that you were -- that you
5   showed the defendant's (verbatim) mother, who was the
6   killer, how to tie the knot.  There was indication in
7   the record that you showed her how to tie the knot and
8   you keep saying, no, I didn't do that, I didn't do that.
9   And until you can convince this side of the table, sir,
10  you're going to have a problem getting a date.  I don't
11  know what else we can do other than have the
12  psychiatrist just do something to make you find those
13  causative factors that made you participate.  Yeah, I
14  understand you're sorry, and I understand that you've
15  taken full responsibility for what your portion was.
16  But the record does not indicate to someone, a human
17  being on this side of the table that will support your
18  version as compared to what the District Attorney and
19  everything else that's in the trial record.  So, you've
20  got to figure out, you know, maybe reach down inside and
21  figure out, wait a minute, maybe I'm missing something,
22  maybe I forgot something, so when you come back to this
23  side for your next hearing, you can say, okay, you know
24  I've thought about it, I've done this, but I didn't do
25  this and do that.  You know you've got to get these
26  stories so they're not inconsistent.  The offense again
27  **ROGER PLANK     D-75871     DECISION PAGE 3     8/9/06**

56

1    was very trivial.  There was evidence that you were

2    angry at her because of the way she was taking care of

3    the kids and messing up the house.  You know you had all

4    the opportunity in the world to stop this from

5    happening, but yet you co-conspired with her to do it,

6    so -- and then you pled guilty.  And perhaps when you

7    pled guilty, you should have just said this is my

8    involvement up to this point rather than let all this

9    other stuff go because now it's in the record, and the

10   record speaks for itself.  These conclusions were drawn

11   from the probation officer's report.  We looked at your

12   unstable social history where you quit school in the 11th

13   grade and there was also some indication that you had

14   experimented with marijuana and cocaine in the past

15   prior to the current offense.  You have programmed

16   extremely well.  There's no getting around that.  You

17   got two vocations, Machine Repair and Upholstery.  You

18   got your GED.  You got your FEMA Certification.  You've

19   been involved with NA/AA, the Impact Program, Anger

20   Management, so you're programming extremely well.  And

21   I'm not going to say that you're not going to get a

22   date.  It's just that at this point, you know, it's very

23   difficult to do that because of the inconsistencies in

24   the stories.  You have five 128 counseling chronos, the

25   last being in '05.  You need to stop getting those.  You

26   had one 115, which you actually should be commended for

27   **ROGER PLANK    D-75871    DECISION PAGE 4    8/9/06**

57

1    that, one 115 and the last one being in '92, so that was

2    14 years ago.  The psychological evaluation by

3    Dr. Macomber, which was done in 3/21 -- I'm sorry.  No,

4    you got a new one here.  It was done in -- The date on

5    this one was 7/30/06 by Dr. Macomber was favorable.  He

6    indicated and I quote:

7         "Mr. Plank did not pose any more risk to

8         society than the average citizen.  And based

9         on life experiences, and maturity, and

10         growth, he poses less risk to society than

11         the average citizen in the community."

12    One thing you really need to firm up is your parole

13    plans.  Okay, you do have a place to live.  You have

14    acceptable marketable skills, but you need to firm up

15    some employment plans, you know.  I mean you indicated

16    that you don't want to be a bother to anyone and we did

17    see evidence of the fact that you are sending notices

18    out and letters out to people to try to get yourself

19    hire, but you may have to be humble.  You know you got

20    the man that said he will allow you to stay with him.

21    See if he can't help you get a lead on some jobs and

22    then send them a copy of your résumé and your letter.

23    That will go a long way in helping you to get -- you

24    know to show this Panel that, hey, when I go out there,

25    I got something that I'm going to be doing instead of us

26    sending you back out there.  As you said before, you

27    **ROGER PLANK    D-75871    DECISION PAGE 5    8/9/06**

58

1    only got 100 dollars saved.  Sending you out there,

2    you're going -- you will be a burden to this gentleman

3    by staying there and you only got 100 dollars in your

4    pocket, so you need to look at it from that standpoint.

5    And if he's willing to let you come and stay with him,

6    I'm sure that it will not be a bother for you to tell

7    him, sir, I need a job too, so you've got to help me

8    find a job.  Look in the paper and let me know what's

9    available that I can apply for.  Nevertheless, you

10   should be commended for earning the two vocations in

11   Upholstery and Machine Repair, your computer skills,

12   working in PIA, and the letter that you got from PIA

13   indicates that you're doing exceptionally good work

14   there, your AA and NA participation, your various

15   laudatory comments, your recent certification for

16   hazardous materials.  So, you're doing everything well.

17   It's just that you've got to get those causative factors

18   and get those parole plans.  Although I've commended you

19   for a lot of things, these behaviors do not outweigh the

20   factors of unsuitability.  This will be a one-year

21   denial, and I think you can get those things dealt with

22   there.  You're working towards it.  Do you have anything

23   you want to add, Sir?

24          DEPUTY COMMISSIONER MORRIS:  I just want to concur

25   with the things that the Chair has said, and I also want

26   to tell you that I really wrestled with your version of

27   ROGER PLANK     D-75871     DECISION PAGE 6    8/9/06

1    the crime.  I'm wrestling with the inconsistencies.

2    Today I deem you than less than truthful about the life

3    crime.  The things that you said and as I measure that

4    against what I have here, this whole C-File, your

5    comments fly in the face of accepting full

6    responsibility.  It makes me question your level of

7    remorse.  I'm not seeing you being completely honest

8    about your level of involvement.  I would tell you that

9    you have absolutely nothing to lose at this point and

10   everything to gain.  And I would encourage you during

11   the next year to think about that.  Be forthright.  Be

12   absolutely honest about what happened.  You have nothing

13   to lose at this point.  It's done.  It's gone.  You

14   can't change the facts.  You need to come here an be

15   able to -- This is your opportunity to present

16   information to this side of the table to the extent that

17   a reasonable person can say you are no longer an

18   unreasonable risk to the community.  I sense a level of

19   remorse, but I don't see you as being where you need to

20   be as yet.  I just wanted to share that with you so you

21   can think about it.  Stay on course with the good things

22   that you're doing, okay.  Good luck, sir.

23        **PRESIDING COMMISSIONER BIGGERS:**  Okay, in addition

24   to that too, I failed to mention on the 3042 responses

25   that we had a letter the San Bernardino Sheriff's

26   Department as well as the response from the District

27   **ROGER PLANK      D-75871      DECISION PAGE 7    8/9/06**

60

1    Attorney of San Diego County indicating an opposition to

2    a finding of parole suitability.  One last thing I

3    wanted to mention to you, sir, and I got it in your --

4    in your last remarks you made about suitability.  You

5    appear to be blaming the Board for not giving you a

6    parole date at this time.  You know but the factors

7    surrounding this -- The factors that we need in order to

8    give you a date we just -- we can't do that now with

9    your story as to what occurred.  The bottom line, as I

10   said before, is that you -- you pled guilty to second-

11   degree murder based on everything that we have here and

12   that's what we have to go to.  And as the Deputy

13   Commissioner said, you know it's up to you to convince

14   this side.  It's not the Board.  Don't blame us, you

15   know.  Think about it for yourself.  And again, I want

16   to wish you luck as well.  I wish you well.  The Panel

17   also wants you to remain disciplinary free, upgrade

18   yourself educationally to the best that you can, and

19   continue to participate in self-help.  Good luck to you,

20   sir, and we wish you well.

21           **INMATE PLANK:**  Thank you.

22                       --o0o--

23   **PAROLE DENIED ONE YEAR**                    DEC 0 7 2006

24   **THIS DECISION WILL BE FINAL ON:_____**

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **ROGER PLANK    D-75871    DECISION PAGE 8    8/9/06**

61

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TAMYRA MORGAN, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 60, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ROGER PLANK, CDC No. D-75871, on AUGUST 9, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated November 6, 2006, at Sacramento County, California.

*Tamyra Morgan*

_____

Tamyra Morgan
Transcriber
**VINE, MCKINNON & HALL**

# Exhibit D

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## DECEMBER 2004 CALENDAR

### PLANK, ROGER

**D75871**

## I.    COMMITMENT FACTORS:

A.    **Life Crime:** Count 1, PC 187, Murder 2nd with use of a weapon (shotgun). San Bernardino County Superior Court Case # BCR950. Sentenced to 15 years to Life plus 1 year enhancement for PC 12022(a) Use of Weapon. Victim: Jennifer Jones, Age: 18 years.

1.    **Summary of Crime:** Some time in late March 1987, San Bernardino County Sheriff's investigators became involved in this case following an abandoned child report. Witness Joanne Knagg had reported the abandoned child situation when she found two notes in her car asking her to care for victim Jennifer Jones' eight-month-old daughter for a few days. The investigation into Jennifer Jones' whereabouts soon indicated the abandonment situation was a ruse to conceal her murder. The situation leading up to the murder was as follows. The victim's mother, Loretta Groat, had met Sherman Giles in North Carolina in April of 1985. Mrs. Groat followed Mr. Giles to California in May 1986, bringing her pregnant daughter, Jennifer Jones, with her. Upon arrival in Twenty-Nine Palms, California, Mr. Giles placed Jennifer in the apartment of his hired hand, Roger Plank. Between December 1986 and March 1987, Mrs. Groat allegedly caught Sherman Giles in her daughter's apartment having sex with Jennifer Jones. Mrs. Groat alleges she found photographs in the apartment indicating the sexual activities between Jennifer and Sherman Giles. She further alleges she had received reports of Jennifer molesting the children of Joanne Knagg who Jennifer baby-sat for. Mrs. Groat discussed the above situation with the prisoner, Roger Plank. He admitted he was also angry with Jennifer because of having to have her in his apartment, her mess in his apartment, and her neglect of her 18-month-old daughter. He agreed to help Mrs. Groat kill Jennifer Jones. He allegedly furnished the murder weapon, a 12 gauge shotgun belonging to Sherman Giles. He assisted Mrs. Groat with advice on how to do the murder, assisted with placing Jennifer in the trunk of a car before the murder and disposed of evidence related to the murder. Jennifer was driven to a remote desert location by Mrs. Groat, shot twice with the shotgun and left to fall down an 80-85 foot mine shaft. The prisoner did not go to the murder site with Loretta Groat and the victim. When questioned by the investigators, inmate Plank initially denied knowledge of the incident. He

SENT TO INMATE ON NOV 3 0 2004

later admitted his part in the crime when told that Mrs. Groat had confessed. The above information was taken form POR, pages 2, 3, 4, 5 and 6.

2.   **Prisoner's Version:** Plank's version of the crime remains the same as stated in previous reports. He stated that the crime occurred essentially as described in the P.O.R. He stated that he participated in the crime out of fear that Mrs. Groat would kill him. He did not think she was serious nor did he think she would really kill her own daughter.

3.   **Aggravating/Mitigating Circumstances:**

   a.   **Aggravating Factors:**

   1. The victim was particularly vulnerable due to her age.
   2. During the commission of the crime the inmate had a clear opportunity to cease but instead continued.

   b.   **Mitigating Factors:**

   1. The inmate had no documented history of criminal behavior.

B.   **Multiple Crime(s):** N/A

   1.   **Summary of Crime:**

   2.   **Prisoner's Version:**

## II.   PRECONVICTION FACTORS:

A.   **Juvenile Record:** None.

B.   **Adult Convictions:** Instant offense only.

C.   **Personal Factors:** Inmate Plank was born in Indiana 05/08/63 to Dorothy and John Plank. He was raised with five sisters, four of whom were older than he. His childhood was unremarkable. He is described by his sister, Tamela Davis, as being law-abiding and helpful to others. The inmate quit school in the eleventh grade. He admits to limited alcohol use and some experimentation with marijuana and cocaine, but denies that substance use had any impact on the commission of the instant offense. This information was taken from the POR, page 6.

## III.   POSTCONVICTION FACTORS:

A.  **Special Programming/Accommodations:** None.

B.  **Custody History:** On 01/21/88 Plank was transferred from San Bernardino County Jail to the California Institution for Men (CIM-RCC). On 02/18/88 he was transferred to the Correctional Training Facility (CTF) for Level-III placement. Plank was placed in Ad Seg on 08/30/88 because it was suspected of being assaulted by his cell partner. He received a CDC-115 for involvement in a physical altercation with his cell partner. On 09/07/88 the charges were dismissed. He was released back to the general population on Close B custody. On 08/20/91 Plank was transferred to the Deuel Vocational Institute (DVI) due to a family hardship. He was released to the general population on Close B custody. On 12/03/91 his custody was reduced to Medium A. On 03/31/93 Plank was transferred to the Correctional Training Facility (CTF) with Medium A custody for Level-II placement.

C.  **Therapy and Self-Help Activities:** While incarcerated for the last 16 years inmate Plank had been assigned to the following education/work/vocational areas:

| ASSIGNMENTS | WORK PERFORMANCE RATINGS |
| --- | --- |
| High School | D letter grades |
| Education Porter | Satisfactory to above average |
| Education Clerk | Above average to Exceptional |
| Textiles | Satisfactory |
| Furniture Upholstery | Average to above average |
| Vocational Upholstery | A & B letter grades |
| Shasta Hall Housing Unit | |
| Porter | Average |
| ABE III/G.E.D. | A+ letter grades |
| High School | A letter grades |
| Yard Crew | Average |
| Educational Tutor | |
| Aide | Reports unavailable |
| Counselor's Aide/Porter | Above average to exceptional |
| Teacher's Aide | Exceptional Grades |
| Vocational Clerk | Exceptional and above average grades |
| Textiles CTF-Central | Above average and average grades |

Inmate Plank has attended alcoholic's Anonymous since 02/89. Also Plank has also received laudatory chronos for his participation, performance and positive attitude as an enrollment & correspondence clerk, as a member of a garment factory critical worker crew, in Vocational Upholstery, ABE I, Literacy Lab and High School Study Program. Additionally Plank, also received a laudatory chrono for his efforts in summoning Staff assistance, and performing CPR and other life-saving techniques on his cellmate R. Bradberry who became seriously ill. (See CDC-128B dated 03/15/99).

**D.** **Disciplinary History:** During his incarceration Inmate Plank has received one CDC-115 Serious Rules Violation Report (Dated 11/4/92) for Out of Bounds. It was reduced to Administrative 128-A. He was found guilty and assessed 30 days loss of privileges. Plank has received three (3) CDC 128-A counseling chronos for the following.

| 02/02/89 | CTF | Smoking in Unauthorized area. |
| 03/07/89 | CTF | Smoking in Unauthorized area. |
| 12/12/90 | CTF | Missing Tool Chits. |

Plank has remained disciplinary free since 11/92, approximately 12 years.

**E.** **Other:** None.

## IV. FUTURE PLANS:

**A.** **Residence:** Plank plans on residing with his friend, Mike Scalase, at 521 South E. Street, Santa Rosa, California. Telephone number (707)431-9170. He states that he can stay with Mr. Scalase for as long as it takes for him to secure an apartment of his own.

**B.** **Employment:** Plank states that he has a job lined up with Maggiora & Chilotti, a construction and trucking company in Santa Rosa. Plank stated the he stays in communication with family members who will support him emotionally and, if necessary, financially. He would like to help his parents and work with young kids.

**C.** **Assessment:** Parole plans appear realistic and with family support inmate Plank should adjust back into society with little difficulty.

## V. USINS STATUS: Plank is a U.S. citizen, born in the state of Indiana on 05/08/63.

## VI. SUMMARY:

**A.** Prior to release the prisoner could benefit from: Remaining disciplinary free and participating in available self-help and therapy programs.

**B.** This report is based upon a two-hour personal interview, incidental contact with the inmate in the housing unit, and thorough research of the central file.

**C.** Inmate Plank was afforded an opportunity to examine his Central File on 9/29/04. pursuant to the Olson Decision.

PLANK, ROGER              D75871                    CTF-SOLEDAD              **DEC/2004**

LIFE PRISONER EVALUATI    REPORT
SUBSEQUENT PAROLE CO    )ERATION HEARING
DECEMBER 2004 CALENDA. .

    **D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole
        Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUAT   REPORT
SUBSEQUENT PAROLE CC    ᗡERATION HEARING
DECEMBER 2004 CALENDA.,

K. Hilliard,                                        Date
Correctional Counselor I

F. Deguzmán,                                        Date
Correctional Counselor II

R. Pope,                                            Date
Facility Captain

D. S. Levorse                                       Date
Classification and Parole Representative

PLANK, ROGER            D75871            CTF-SOLEDAD            **DEC/2004**

$\varepsilon/q$   $\swarrow$

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## APRIL 2006 CALENDAR

**PLANK, ROGER**                                                        **D75871**

### I.    COMMITMENT FACTORS:

A.    **Life Crime:**  Count 1, PC 187, Murder Second with Use of a Weapon (Shotgun). San Bernardino County Superior Court Case #ECR950. Sentenced to 15 years to Life plus 1 year enhancement for PC 12022(a) Use of Weapon. Victim: Jennifer Jones, age: 18 years.

    1.    **Summary of Crime:**  Remains the same as stated in the previous hearings.

    2.    **Prisoner's Version:**  Inmate Plank stated his version of the crime remains the same as stated in the previous reports.

    3.    **Aggravating/Mitigating Circumstances:**

        a.    **Aggravating Factors:**  Remains the same as stated in the previous hearings.

        b.    **Mitigating Factors:** Remains the same as stated in the previous hearings.

B.    **Multiple Crime(s):**  N/A.

    1.    **Summary of Crime:**.N/A.

    2.    **Prisoner's Version:**  N/A.

### II.    PRECONVICTION FACTORS:

A.    **Juvenile Record:** None.

B.    **Adult Convictions and Arrests:**   Documents from the previous hearings have been considered and that information remains valid.

Sent to Inmate on  1 /17/ 06

    C.   **Personal Factors:** Documents from the previous hearings have been considered and that information remains valid.

## III.  POSTCONVICTION FACTORS:

    A.   **Special Programming/Accommodations:** None.

    B.   **Custody History:** Documents from the previous hearings have been considered and that information remains valid. During the time since his last hearing, the prisoner has remained at CTF Soledad and housed among the general population. His custody remains at Medium A.

    C.   **Therapy and Self-Help Activities:** Plank participated in the Alcoholics Anonymous programs "Groups C and D". He attended a 3 hour video instruction/discussion of issues related to successfully re-engaging into society.

    D.   **Disciplinary History:** (Refer to disciplinary sheet).

    E.   **Other:** On 4/28/05, Plank signed a waiver of hearing and stipulation to unsuitability. The Board granted Plank a 1 year denial and made the following recommendations: Remain disciplinary free, learn a trade, participate in self help and therapy programs, and earn positive chronos.

## IV.  FUTURE PLANS:

    A.   **Residence:** Plank plans to reside with his friend, Mike Scalase. His address is 521 South E. Street, Santa Rosa, California. Telephone Number (707) 431-9170. Plank stated that he would be able to stay with Mr. Scalase for as long as it takes for him to secure an apartment of his own.

    B.   **Employment:** Plank stated that he will work with Maggiora and Chilotti, a construction and trucking company in Santa Rosa.

    C.   **Assessment:** Plank appears to have realistic parole plans. He stated that support letters are forthcoming.

## V.  USINS STATUS: He is a United States Citizen.

## VI.  SUMMARY:

LIFE PRISONER EVALUAT    REPORT                                                3
PAROLE CONSIDERATION HEARING
APRIL 2006 CALENDAR

A.    Prior to release the prisoner could benefit from: 1) Remaining disciplinary free,
      and 2) attending self help and therapy programs.

B.    This report is based upon a 1 1/2 hour interview with inmate Plank, and a 2 hour
      review of his Central File on 12/5/05.

C.    Inmate Plank was afforded an opportunity to examine his Central File pursuant to
      the Olson Decision. He reviewed his file on 12/5/05.

D.    No accommodation was required per the Armstrong vs. Davis BPH Parole
      Proceedings Remedial Plan (ARP) for effective communication.

## DISCIPLINARY SHEET

### CDC 128A's:

| | |
|---|---|
| 02/02/89 | Smoking in Unauthorized area. |
| 03/07/89 | Smoking in Unauthorized area. |
| 12/13/90 | Missing Tool Chits. |
| 07/01/05 | Violating No Smoking Policy. |
| 09/15/05 | 3005(B) |

### CDC 115's:

11/04/92   CTF-C   3015  Out of Bounds   Reduced to Administrative. Guilty: 30 days loss of privileges.

# Exhibit
# E

**MENTAL HEALTH EVALUATION FOR**
**THE BOARD OF PRISON HEARINGS**
**August, 2006 Lifer Calendar**

**CORRECTIONAL TRAINING FACILITY SOLEDAD**
**JULY, 2006**

| | |
|---|---|
| **NAME:** | **PLANK, ROGER** |
| **CDC#:** | **D-75871** |
| **DOB:** | **5/8/63** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **3/27/87** |
| **SENTENCE:** | **15 YEARS TO LIFE** |
| **MEPD:** | **12/1/97** |
| **EVALUATION DATE:** | **7/28/06** |

## I.    IDENTIFYING INFORMATION:

Mr. Roger Plank is a 43 year old, first term, single, Caucasian male from San Bernardino County. He is a Christian. He has served 18 years in custody.

### SOURCES OF INFORMATION:

This evaluation is based upon a single 2 hour interview, plus review of the central and medical files.

The psychological evaluation, dated 11/24/98, by Dr. Terrini, Psychologist at CTF-Soledad, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. Also, this information was again listed by Dr. Gamard on 10/16/02. It was updated on 3/21/05 by Dr. Talbott, Psychologist. Therefore, this information will not be repeated at this time.

PLANK, ROGER
D-7581
7/30/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Plank related during the interview in a serious, calm, open and cooperative manner. His mental status was within normal limits. There was no evidence of any mental or emotional problems. His thinking was rational and logical. His speech was normal, fluent and goal oriented. Intellectually, he was functioning in the average to high average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were good.

Mr. Plank does not have a history of drug or alcohol abuse problems. He stated that he experimented briefly as a teenager with drugs, but never became involved with them. However, he attends Alcoholics Anonymous. Although he does not need to attend Alcoholics Anonymous, because he does not have a history of drinking, he goes to this program because it is a self-help program, and he believes that it may help him understand life better.

Mr. Plank has completed his GED. In addition, he has completed two vocational trades, Vocational Upholstery and Vocational Sewing Machine Repair. He still is working in that field. He is employed now in PIA Industries as a sewing machine mechanic and as an upholsterer. His skills are current and valid. Mr. Plank also has worked as a clerk in the institution. He also has skills on the computer. There is no evidence of any mental or emotional problems. I agree with the prior psychological evaluator that has stated that there is no evidence of any diagnosable mental disorder in this case.

### CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 90 |

### XIII.  REVIEW OF LIFE CRIME

Mr. Plank discussed the circumstances of the commitment offense at length. He accepts full responsibility for his role in the commitment offense. He stated, "I did give her the shotgun. I am as guilty as if I shot her myself." Mr. Plank went

PLANK, ROGER
D-7581
7/30/06
PAGE 3

on explaining that he did not think that Muretta Groat would actually kill her own daughter. He thought that the mother, when she tied the daughter up was only trying to scare the daughter and get her to leave the area. He stated that he did not go to the scene of the crime, and he has no idea where the crime occurred. He did not help carry the daughter to the car and did not coach the mother on how to kill her daughter. He only learned that Muretta Groat had killed her daughter later, when she brought back clothes and asked him to burn them. He stated that at that time he was young and naïve. He was 24 years of age at that time. He stated that he was very frightened, and he did not know what to do. He commented several times that he feels very badly at the daughter's loss of life. He stated that it was a very serious mistake to ever give the shotgun to the mother. He also feels very badly that he did not contact the police in time in order to report the situation. When he learned about what had happened, he was terrified, alarmed, and confused, and he had no idea what he should do. He stated that he feels very badly about this situation. His feelings of sorrow and remorse appear to be quite sincere and genuine.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, Mr. Plank has never been involved in any serious disciplinaries involving violence, possession of weapons, assaults on others, or other dangerous behavior. He only has one disciplinary in 1992 for being out of bounds during count. To remain disciplinary free in an institution where there are currently frequent riots, assaults on others and other interpersonal conflicts is certainly commendable. Mr. Plank demonstrates good self-control, maturity and responsibility. In comparison to other inmates, potential for dangerous behavior is below average.

B. In considering potential for dangerous behavior when released to the community, I agree with the prior evaluator that has stated that he poses a below average potential for dangerous behavior in comparison to the average citizen in the community. This was stated by Dr. Terrini in 1998, and it was repeated by Dr. Gamard in 2002. This conclusion is supported by the administration of the Level of Service Inventory-Revised. This is an actuarial measure that assesses criminal history, substance abuse history (in this case no history), current attitudes, and achievements in prison in order to determine current risk level on parole. He obtained a score of 0.4 cumulative frequency for community offenders. He also obtained a score of 0.8 cumulative frequency for prison inmates. This score means that if 100 men were released on parole, he would be

PLANK, ROGER
D-7581
7/30/06
PAGE 4

expected to do better on parole than 99 of them. This is an extremely low risk level. Mr. Plank does not pose any more risk to society than the average citizen, and based upon his life experiences, maturity and growth; he poses less risk to society than the average citizen in the community.

C. There are no significant risk factors in this case.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Plank has excellent vocational skills, which will enable him to secure employment in the community. He has contacted several agencies that promise him employment and assistance as soon as he is released. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:     7/28/06
T:     7/30/06

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015.5)

I, _____ Roger Plank _____ , declare:

I am over 18 years of age and I am party to this action.  I am a

resident of CORRECTIONAL TRAINING FACILITY prison, in the County

of Monterrey, State of California.  My prison address is:

Roger Plank _____ , CDCR #: D-75871 _____
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: ED-017-Low
SOLEDAD, CA  93960-0689.

On ___ June 28, 2008 _____ , I served the attached:

Petition for writ of habeas corpus.

on the parties herein by placing true and correct copies

thereof, enclosed in a sealed envelope (verified by prison

staff), with postage thereon fully paid, in the United States

Mail in a deposit box so provided at the above-named institution

in which I am presently confined.  The envelope was addressed as

follows:

US DISTRICT COURT
450 GOLDEN GATE AVE
PO BOX 36060
SAN FRANCISCO, CA 94102-9680

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on ___ JUNE 28, 2008 _____ .

_Roger Plank_
ROGER pLANK

Declarant

ROGER PLANK
D-75871 ED-017-LOW
P.O. BOX 689
SOLEDAD, CA 93960-0689

ROGER PLANK
CORRECTIONAL TRAINING FACILITY
D-75871 ED-017-LOW
P.O. BOX 689
SOLEDAD, CA 93960-0689



## BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO. 12615    WASHINGTON DC

POSTAGE WILL BE PAID BY UNITED STATES COURTS

US DISTRICT COURT
450 GOLDEN GATE AVE
PO BOX 36060
SAN FRANCISCO CA 94102-9680

RECEIVED
JUL - 2 2008

SAN FRANCISCO, CA P&DC POSTAGE DUE SEC
JUL - 2 2008



ROGER PLANK
CORRECTIONAL TRAINING FACILITY
D-75871  ED-017-LOW
P.O. BOX 689
SOLEDAD, CA 93960-0689

# BUSINESS REPLY MAIL

FIRST-CLASS MAIL    PERMIT NO. 12615    WASHINGTON DC

POSTAGE WILL BE PAID BY UNITED STATES COURTS

US DISTRICT COURT
450 GOLDEN GATE AVE
PO BOX 36060
SAN FRANCISCO CA 94102-9680

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

